STATE of Wisconsin EX REL. Leon IRBY, Petitioner-
Appellant,

v.

Thomas ISRAEL, Respondent.

Court of Appeals

*No. 79–1332. Argued July 17, 1980.—Decided January 27, 1981.*
(Also reported in 302 N.W.2d 517.)

For the petitioner-appellant there were briefs by *Elizabeth Alexander*, assistant state public defender and oral argument by *Elizabeth Alexander*, assistant state public defender.

For the respondent there was a brief by *Bronson C. La Follette*, attorney general, and *Robert D. Repasky*, assistant attorney general, and oral argument by *Robert D. Repasky*, assistant attorney general.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

GARTZKE, P.J.   Petitioner Leon Irby appeals from a judgment dismissing his petition for a writ of habeas corpus.

February 12, 1972, petitioner began serving a life sentence for first-degree murder. November 1, 1974, he fatally stabbed another inmate. May 5, 1975 he was convicted of second-degree murder and sentenced to not more than fifteen years, consecutive to his original sentence.

After the assault, petitioner was immediately placed in temporary lockup status, pending an investigation of the assault. November 12, 1974 the Program Review Committee of Waupun Correctional Institution removed him from the general prison population and placed him in administrative segregation status. Administrative segregation is an involuntary, nonpunitive segregated confinement, designed to protect the staff and resident population and to avoid repetitious use of the disciplinary

process.[1] Administrative segregation is now known as administrative confinement and is referred to as such in

[1] According to the *Manual of Resident Status Rules and Penalties* in effect at the time of petitioner's initial placement in November 1974, the institution population was divided between the general population and the segregated population. The status of a resident in the segregated population is either nonpunitive or punitive. Administrative segregation is a nonpunitive status which the *Manual* describes as follows:

This involuntary, non-punitive, segregated status is available for those few residents whose conduct has created a danger of harm to others and have been penalized by either or both Isolation or Adjustment Status for such conduct and for those residents who have been penalized two or more times by commitment to Idle Status because of job related misconduct.

It is the purpose of this status to afford protection to staff and resident population and to avoid repetitious use of the disciplinary process when possible.

Residents may be assigned to this status following a punitive, segregated status, by the Associate Warden-Security upon recommendation of the Reclassification Committee.

The Associate Warden-Security may reassign the resident from this status at any time, when in his opinion, the need for further segregation no longer exists. If the resident is not reassigned within 90 days, he shall be interviewed immediately by the Reclassification Committee which shall make its recommendation for future assignment to the Associate Warden-Security.

Residents in this status shall be afforded such treatment as is available.

Inmates in administrative segregation status (now known as administrative confinement) are located in at least two areas, a separate segregation building and North Cell Hall. Appellant indicates that North Cell Hall is less restrictive than the segregation building, and affords the inmate more privileges and access to programs.

According to the brief submitted by the attorney general, although administrative segregation necessarily implies removal from the general prison population, it otherwise permits all activities that are not necessarily precluded by the need to maintain security and separation. A.P. 3.020 (*see* n. 4 *infra*) provides that residents in this status have restricted mobility but shall be accorded program opportunities including visits, correspondence,

this opinion. Except for the time he has been out of the institution and the times he has been placed in punitive segregation status for misconduct,[2] petitioner has re-

education, hobby, library services, chaplain services in the cell and social and clinical services contacts. Appellant asserts that he is confined under the following conditions: His cell is on the same row with cells used for punitive isolation. The building is noisy twenty-four hours per day. His cell contains little light and his meals are served with paper plates and plastic utensils. He is locked in his cell approximately twenty-three and one-half hours per day. He is allowed outdoor exercise thirty minutes per day, four days per week, and two hours of visiting time per month. He is under guard supervision and must wear leg irons, a waist belt and handcuffs when he leaves his cell for any reason. He is subject to visual body cavity searches each time he is outside the cell. Inmates in the segregation building are subject to short-term deprivations of meals, electricity, and water and to short term window closings in the summer months. Ninety percent of the segregation building is black. The staff is white. The building contains no programs or treatment staff. No progress reports on an inmate are required. He has no access to religious services or personal visits with his minister.

[2] The February 1979 opinion of the administrative hearing committee lists seventeen major conduct reports as to petitioner in which major penalties were invoked. They are:

5–12–72—Assaulting an inmate. Solitary three days and loss of five days good time.

7–24–73—Creating a disturbance, orders, [sic] out of assigned area. Placed in idle gang.

8–8–73—Altering nail clippers into a weapon and possession of unauthorized weapon. Three days solitary and loss of ten days good time.

10–19–73—Assaulting another inmate. Nine days solitary and loss of twenty days good time.

12–18–74—Disobeying orders, sanitation rules, and grooming rule. Three days isolation.

1–17–75—Disobeying orders. Creating a disturbance and unauthorized talking. Three days isolation.

1–27–75—Disrespectful, disobeying orders, creating a disturbance, using indecent language and unauthorized talking. Isolation nine days and loss of twenty days good time.

mained in administrative confinement. The issues pertain to petitioner's initial and continued placement in administrative confinement. He does not contest the propriety of his placement in temporary lockup or punitive segregation.

April 18, 1977, Irby filed a petition for a writ of habeas corpus, challenging his initial and continued administrative confinement. He alleged that he has been confined in the segregation building at Waupun since November 1, 1974 because of his 1975 murder conviction; that he has been denied due process by the lack of hearing to determine whether he should remain in the segregation building and by the prison's failure to follow its own rules; that his continued confinement is arbitrary and capri-

2-4-75—Disobeying orders, unauthorized talking, disrespectful, threatening staff, using indecent language. Isolation nine days and twenty days loss of good time.

3-4-75—Disrespectful, assaulting staff, threatening staff, creating a disturbance and unauthorized talking. Isolation nine days and loss of twenty days good time.

4-30-75—Disobeying orders, possession of contraband, and unauthorized transfer of property. Isolation four days.

7-29-75—Disobeying orders. Isolation three days.

9-30-75—Disrespectful, disobeying orders, unauthorized transfer of property. Isolation six days.

1-16-76—Causing a disturbance and talking. Isolation three days.

1-30-76—Talking and disrespect. Isolation seven days.

3-2-76—Talking, state property, [sic] attempts, [sic] unauthorized communications, orders. [sic] Isolation nine days.

4-9-76—Storage, weapons. Isolation nine days, loss of twenty days good time.

9-30-77—Orders, [sic] unauthorized transfer, unauthorized possession. Three days adjustment segregation.

The April 9, 1976 conduct report was expunged pursuant to a judgment of the Dodge County Circuit Court. The September 30, 1977 conduct report was the subject of *State ex rel. Irby v. Israel*, 95 Wis.2d 697, 291 N.W.2d 643 (Ct. App. 1980), by which that report and the discipline imposed were vacated and the matter was remanded for further proceedings.

cious; that he has been denied equal protection because other inmates convicted of equally serious offenses remain in the general population of the prison; and that his continued confinement constituted cruel and unusual punishment.

In a series of interim decisions, the trial court conscientiously reviewed existing procedures and devised new procedures for inmates in administrative confinement.[3] After a 1978 hearing which the court held was insufficient, the court ordered that petitioner be granted a hearing on the issue whether he should be returned to the general prison population, pursuant to newly developed departmental rules.[4] An "administrative hearing" was held in February 1979, following which the hearing committee rendered a divided decision. The minority

---

[3]The trial court determined that no hearing was required to place an inmate in administrative confinement, but to retain an inmate in segregation, he had to be given a yearly hearing incorporating the minimal procedural protections of *State ex rel. Terry v. Schubert,* 74 Wis.2d 487, 497, 247 N.W.2d 109, 114 (1976) (*Terry I*). The court ordered the warden to establish procedures and standards conforming to *Terry.* Petitioner moved for reconsideration of that decision, arguing that *Enomoto v. Wright,* 434 U.S. 1052 (1978), compelled the conclusion that an inmate is entitled to a due process hearing before he is initially placed in administrative segregation. The court concluded that *Enomoto* was not controlling, and continued its order. The warden established procedures and standards which attempted to conform to the court's order and held a hearing pursuant to those standards in April 1978. The warden submitted copies of the procedures and standards and the record of the April 1978 hearing to the court. The court determined that the procedures submitted did not provide petitioner with due process, and again ordered that conforming standards and procedures be established. In October 1978 the warden submitted new standards and procedures which the court held afforded petitioner due process and ordered the hearing which was held February 15, 1979.

[4] Department rules, developed in response to court orders outlined in n. 3, were promulgated as A.P. 3.020, effective April 10, 1978, and amended October 17, 1978, pursuant to court order.

member recommended that petitioner be returned to the general prison population. The two-member majority recommended that petitioner's present status continue but that steps could be taken to prepare petitioner more adequately for return to the general population and to provide the superintendent with a "more valid measure to predict his behavior in a somewhat freer environment." The majority recommended that a current psychiatric evaluation of petitioner be obtained, that he be transferred to a social rehabilitation unit program in a general population at another correctional institution, and that he be returned to administrative confinement in North Cell Hall after successful completion of the social rehabilitation program, following which a further hearing would be held to review the recommendations of the social rehabilitation unit. The superintendent adopted the majority's recommendations, pursuant to review required by department rules.

On the basis of the original return to the writ and the record of the 1979 hearing the court affirmed the decision and ordered judgment dismissing the writ. The court subsequently denied petitioner's motion to supplement the record with posthearing developments which made the steps recommended by the committee unavailable to him and entered judgment dismissing the writ.

Petitioner raises the following issues:

1. Was petitioner entitled to a due process hearing regarding the initial decision to confine him to administrative confinement?

2. Did the hearing on petitioner's continued segregation deny him due process by failing to disclose the evidence against him and by failing to provide a meaningful opportunity for cross-examination?

3. Was the decision of the hearing committee arbitrary and unreasonable because it was based on the false assumption that petitioner would be afforded a program

designed to return him to the general prison population?

4. Did the procedures by which the hearing committee reconsidered its decision deny petitioner due process and require the trial court to hold an evidentiary hearing regarding the possibility of ex parte communications between respondent's counsel and the administrative fact finder?

5. Did the proceedings, taken as a whole, deny petitioner a fair hearing?

### 1. *Mootness Of Propriety Of Initial Placement In Administrative Segregation*

Petitioner demands a due process hearing on the merits of his initial placement. The issues in that hearing would be framed by a regulation which has been modified since November 1974 and is, we are informed by the attorney general, the subject of proposed revisions now under consideration. If we were to order that hearing at this late date, it would be based upon November 1974 facts. Those facts do not include petitioner's subsequent plea of guilty to second-degree murder, which established that he caused the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life. Sec. 940.02, Stats. 1973. Findings made without taking the fact of that plea into account would lack reality. The hearing would ignore the opinion of the majority of the hearing committee formulated after the February 1979 hearing that petitioner should remain in administrative confinement. Petitioner does not contend that he should be released to the general prison population as the result of what he contends is the initial hearing to which he was entitled.

It would be an empty charade with a meaningless result, were we to decide whether petitioner was entitled to a due process hearing on his initial placement. Resolu-

tion of the issue raised as to the initial placement would have no practical legal effect on the controversy between appellant and respondent. That issue is therefore moot and beyond the scope of our review. *Milwaukee Police Asso. v. Milwaukee,* 92 Wis.2d 175, 183, 285 N.W.2d 133, 137 (1979). The real issue is whether petitioner's administrative confinement should be continued.

### 2. *Continued Confinement*
### A. *Due Process Applies*

Petitioner has a state-created interest protected by due process in his eventual return to the general prison population. He was put in administrative confinement because his conduct created a danger of harm to others. Administrative confinement is inherently temporary. An inmate in administrative confinement is entitled to return to the general prison population when the danger causing that confinement no longer exists.

Petitioner therefore has an expectation that when the reason for his segregation no longer exists, he will return to the general prison population. The straitened conditions of administrative confinement make the expectation of return a substantial interest.

Accordingly, the state has created a conditional liberty interest available to petitioner which is entitled to protection under the fourteenth amendment to the United States Constitution. *State ex rel. Terry v. Percy,* 95 Wis. 2d 476, 481, 290 N.W.2d 713, 716 (1980) *(Terry III)*; *State ex rel. Terry v. Schubert,* 74 Wis.2d 487, 497, 247 N.W.2d 109, 114 (1976) *(Terry I).*

### B. *Evidentiary Disclosure And Cross-Examination Not Required*

The Division of Corrections developed A.P. 3.020 in response to the directions by the trial court as to the

hearing which must be held on the question whether a resident shall be continued in administrative confinement after twelve months of that confinement.

A.P. 3.020 provides, in material part, that the resident will be provided with an administrative hearing conducted by a committee. A committee member is directed to obtain written material or opinions from institutional staff, to schedule the hearing within ten workdays following twelve months of confinement, and to serve the resident with a notice of the hearing. The notice states that the hearing is an investigation of the reasonableness of returning the inmate to the general population, that the resident may have a staff advocate, that the resident's entire institution performance together with any prehearing investigative information will be considered, and that the resident may testify, present evidence, and request that witnesses be present. The rule states the standards to be considered for release from continued confinement, consisting of specified offense data, specified factors pertaining to the resident's motivation and behavior, the views of the staff as to security problems, institutional ability to meet the needs of the resident, and staff recommendations.

Petitioner contends that A.P. 3.020 violates his right to due process because it does not require disclosure of the evidence against him and does not give him the right to cross-examine witnesses whose opinions and factual assertions are taken into account.

Petitioner's contention was decided adversely to him by *Terry III* in which the supreme court dealt with the due process requirements for reexamination of a sex crimes commitment. Section 975.11, Stats., provides that the department shall discharge any person committed to it under the sex crimes act "as soon as in its opinion there is reasonable probability that he can be given full liberty without danger to the public . . . ." The supreme

court had previously concluded in *Terry I,* 74 Wis.2d at 497, 247 N.W.2d at 114, that due process required, among other things, disclosure of the evidentiary material which would be considered by the hearing body and the right to confront and cross-examine witnesses, in the absence of good cause, citing *Morrissey v. Brewer,* 408 U.S. 471, 489 (1972). *Terry III* excluded evidentiary disclosure and confrontation and cross-examination from those requirements. 95 Wis.2d at 481–83, 290 N.W.2d at 716.[5]

The rationale stated in *Terry III* for reduced minimum due process requirements for reexamination of a sex crimes commitment is as follows:

As in *Greenholtz* [*v. Nebraska Penal Inmates,* 442 U.S. 1 (1979)], the discharge from commitment with which we are concerned involves a denial to the committee of a conditional liberty which he desires, not a deprivation of liberty which he already has. Also, the decision to discharge a person from commitment is a discretionary decision which depends on numerous elements, some of which are factual, but many of which are subjective appraisals by the department. The decision to discharge may be made for several reasons and may involve nothing more than an informed prediction as to what would best

---

[5] *Terry I, supra* n. 3, was vacated by the United States Supreme Court in *Percy v. Terry,* 434 U.S. 808 (1977), and remanded to the Wisconsin Supreme Court to consider whether its judgment is based on federal or state constitutional grounds, or both. *State ex rel. Terry v. Percy,* 84 Wis.2d 693, 267 N.W.2d 380 (1978) *(Terry II),* held that *Terry I* was based on federal constitutional grounds. The United States Supreme Court in *Percy v. Terry,* 443 U.S. 902 (1979), again vacated the judgment of the Wisconsin Supreme Court and remanded the case for further consideration in light of *Parham v. J.R.,* 442 U.S. 584 (1979), and *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1 (1979). In *State ex rel. Terry v. Percy,* 95 Wis.2d 476, 481, 290 N.W.2d 713, 716 (1980) *(Terry III),* the Wisconsin Supreme Court modified *Terry II* to require process "less stringent than the procedures we adopted in *Terry I*." The requirements of *Terry III* are summarized in n. 6.

serve to protect the public or promote the welfare of the sex offender. 95 Wis.2d at 481–82, 290 N.W.2d at 716.

The decision whether to transfer an inmate from administrative confinement to the general prison population is within the rationale of *Terry III.* Accordingly, petitioner is entitled to the minimum due process requirements regarding the making of that decision which are set forth in *Terry III.*[6] As those requirements do not include disclosure of evidence and confrontation and cross-examination of witnesses, A.P. 3.020 does not deny petitioner due process.

### 3. *Committee's Decision Not Rendered Retroactively Arbitrary Or Unreasonable*

Petitioner argues that the committee's decision was arbitrary and unreasonable because its recommendations depended on assumptions which proved not to be well founded. We reject the contention.

The hearing committee recommended that petitioner continue in administrative confinement but that the steps previously described be taken to prepare him for return to the general prison population and to assist the superintendent in predicting his behavior in a freer environ-

---

[6] Those minimum requirements include:

(1) [P]rior written notice of the examination.

(2) disclosure of the factors which will be considered by the decision maker.

(3) opportunity to be present and make oral or written statements and present documentary evidence.

(4) decision maker to be a person not involved in the direct care, treatment, or supervision of the sex offender.

(5) a record of the proceedings must be maintained, as provided by sec. 975.09, Stats.

(6) a written decision to be given to the sex offender stating the reasons for the decision.

(7) review by the department of a decision at the request of the sex offender. *Terry III,* 95 Wis.2d at 482, 290 N.W.2d at 716.

ment. A crucial step in that recommendation, transfer to a social rehabilitation unit in a general correctional population at another institution, was subsequently frustrated. According to petitioner's affidavit, the social rehabilitation program was terminated sometime in June 1979 and the new program does not accept inmates with past assaultive records.

An arbitrary or capricious decision is either so unreasonable as to be without a rational basis or is the result of an unconsidered, wilful or irrational choice of conduct. *Robertson Transport. Co. v. Public Serv. Comm.,* 39 Wis.2d 653, 661, 159 N.W.2d 636, 640 (1968) ; *Pleasant Prairie v. Johnson,* 34 Wis.2d 8, 12, 148 N.W.2d 27, 30 (1967). An administrative decision which is reasonable when made on the basis of existing or predictable facts cannot be said to be rendered arbitrary, capricious or unreasonable because the facts upon which it was based subsequently changed.

Petitioner does not challenge the reasonableness of the committee's decision when it was made. Accordingly, the impact of future facts on that decision does not affect its validity, unless the decision was conditioned on other facts.

The majority of the committee unconditionally recommended that petitioner be continued in administrative confinement. The majority of the committee recommended that if the various outlined steps occurred, consideration of a general population placement will be seriously considered. Nothing in the committee's report suggests, however, that completion of the recommended steps would guarantee petitioner's release into the general population or that failure to complete those steps would preclude a release.

We conclude that the absence of the social rehabilitative program ordered by the committee in its recom-

mendations does not render its decision arbitrary or unreasonable.

### 4. *Ex Parte Communication*

The hearing committee's decision relied greatly on a 1976 conduct report in which petitioner was charged with possessing a weapon, a razor blade. Petitioner advised the court that the conduct report had been expunged from his record by court order before the committee held its hearing. The assistant attorney general filed a supplemental return with a letter stating that the return pertains to petitioner's objection to use of the expunged report which the assistant attorney general had called to the attention of the Division of Corrections.

Attached to the supplemental return is a report signed by the committee stating that they had been unaware that the conduct report had been expunged, that they have reconsidered their decision, and that the minority member recommends petitioner's release and the majority recommend he remain in administrative confinement. The majority state that their primary concern continues to be that petitioner was sentenced for murder, entered the general prison population and committed another murder. The majority state that they are also concerned with other assaultive incidents on petitioner's part. Petitioner did not receive a copy of the communication by the assistant attorney general to the division or notice that the committee was reconsidering its decision.

Ex parte written communications by a lawyer to a judge or official before whom an adversary proceeding is pending are prohibited by DR 7–110(B)(2), which was in effect at the time in question, unless the lawyer promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer. *Code of Professional Responsibility*, 43 Wis.2d

vii, lxvii (1969).[7] The assistant attorney general states that his communication was to the Division of Corrections. There is no evidence that the lawyer used the client as a conduit for an ex parte communication to the decision maker. The communication has not been shown to be prohibited by DR 7–110 (B) (2).

An ex parte communication, moreover, is a material error only if the adverse party is prejudiced by an inability to rebut the facts communicated and if improper influence on the decision maker appears with reasonable certainty to have resulted. *Seebach v. Public Service Commission,* 97 Wis.2d 712, 721, 295 N.W.2d 753, 759 (Ct. App. 1980).

The fact communicated to the hearing committee was the very fact petitioner's counsel called to the trial court's attention: that a conduct report considered by the committee had been expunged. The decision of the committee on reconsideration contains internal evidence which confirms the nature of the communication to it.

Petitioner cites no evidence of improper influence on the committee. The trial court found that the expunged conduct report was not a factor in the decision of the hearing committee on reconsideration. The supplemental return confirms that that is true.

5. *The Proceedings, Taken As A Whole, Have Not Denied Petitioner A Fair Hearing*

Petitioner by cumulating the previous claims, contends that the proceeding as a whole denied him a fair hearing. The contention is groundless. The proposition that a series of unsubstantiated claims of error constitute a single error has no basis in law. *Larson v. State,* 86 Wis. 2d 187, 200, 271 N.W.2d 647, 652 (1978); *Kohlhoff v.*

[7] DR 7–110 (B) (2) became SCR 20.44 (2) (b), effective January 1, 1980.

*State*, 85 Wis.2d 148, 161, 270 N.W.2d 63, 69 (1978); *Mentek v. State*, 71 Wis.2d 799, 809, 238 N.W.2d 752, 758 (1976).

Administrative confinement creates a cruel dilemma for the segregated inmate, other inmates and the institution. It is imposed to protect other inmates and is to end when no longer necessary; but it is a poor environment in which the segregated inmate can show, and from which the institution can predict, that others will not be endangered if he mixes with them. The institution need not indulge a hazardous experiment and we are of course aware that the first cause of the dilemma is petitioner's own behavior. We nevertheless urge that the search continue for better ways to assess his present character.

*By the Court.*—Judgment affirmed.