#26087-a-JKK

**2012 S.D. 54**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ALLISON MARKO,                                  Plaintiff and Appellee,

    v.

JAMES MARKO,                                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

* * * *

KAREN L. CREW of
Crew & Crew
Sioux Falls, South Dakota                       Attorneys for plaintiff and
                                                appellee.


CHET GROSECLOSE
Sioux Falls, South Dakota                       Attorney for defendant and
                                                appellant.



* * * *

CONSIDERED ON BRIEFS
ON FEBRUARY 14, 2012

OPINION FILED **06/27/12**

KONENKAMP, Justice

[¶1.]        In this divorce appeal, the father asserts that the trial judge (1) should have disqualified himself; (2) abused his discretion in restricting visitation; and (3) erred in granting the mother a divorce on grounds of extreme mental cruelty.

## Background

[¶2.]        Allison Marie and James (Jim) Joseph Marko married on September 26, 1998.  Three children were born of the marriage: Ashley on October 2, 2001, Caden on January 14, 2006, and Carson on January 8, 2008.  Allison, a dental assistant, has always been the primary wage earner for the family, working full time and earning nearly twice what Jim earned.  Jim has held several positions over the years, but none full time.  He worked part time for an ambulance service as an EMT.  He has an associate's degree in law enforcement, but has served only as a volunteer reserve police officer.  Jim testified that he presently works as a seasonal employee in the construction industry and operates a snow plow in the winter.  When there is no work, he "fall[s] back on unemployment" compensation benefits.

[¶3.]        In 2007, while Jim was working part time at a restaurant, he struck up a friendship with a sixteen-year-old female coworker, K.S.  At the time, Jim was attending training to become an EMT.  K.S. expressed a similar interest, and Jim invited her to ride to training with him.  K.S. would later testify that she and Jim, on two occasions, drove to Lake Alvin and had sexual intercourse.  Jim was then thirty-two years old and K.S. was a high school junior.  When K.S. told her parents about her relationship with Jim, they contacted the authorities.  The matter was investigated, but K.S. was at the age of consent, so no charges were brought.  *See*

SDCL 22-22-1(5).  When Allison learned of Jim's infidelity, she called K.S., who confirmed her sexual liaison with Jim.  Allison was pregnant with Carson at the time.

[¶4.]     In March 2010, the Marko family was eating at a restaurant when an eighteen-year-old employee, Emmy, passed out and hit her head.  Jim, as an EMT, gave assistance.  Emmy later located Jim on Facebook and sent him a message thanking him for his help.  She offered to babysit the Marko children, and she was invited to dinner to become better acquainted.  Not long afterwards, Emmy called Jim in the middle of the night to say that her boyfriend had assaulted her and she had nowhere to go.  She came to the Marko home and spent the night.  After that, she began spending more time with the family.

[¶5.]     Allison and Jim's relationship was deteriorating.  Jim asked Allison to attend marital counseling.  But having previously attended couples' counseling with Jim, Allison opted to see a therapist individually.  She had decided to end the marriage.  In July 2010, Allison brought a divorce action on grounds of irreconcilable differences or, in the alternative, extreme cruelty.  Jim moved out of the marital home and into a nearby apartment.  The children remained with Allison.

[¶6.]     Allison soon petitioned the circuit court for a temporary protection order, asserting that Jim was harassing her.  The order was granted, but was later allowed to expire.  By stipulation, a temporary order was entered providing that Jim and Allison would have joint legal custody of the children, with primary physical custody for Allison, and parenting time for Jim consistent with South

Dakota's guidelines. *See* SDCL ch. 25-4A (Appendix A, South Dakota Parenting Guidelines).

[¶7.]     In October 2010, Emmy moved in with Jim. She had graduated from high school, obtained part-time employment, and started college in Sioux Falls. Jim and Emmy shared monthly expenses and the same bed. And although they conceded there might be kissing and hand holding on occasion, in court they denied any sexual relations. Jim explained that they were not an "exclusive dating couple."

[¶8.]     Emmy developed a close relationship with the Marko children, Ashley in particular. Then nine years old, Ashley considered Emmy her "best friend." Ashley's relationship with her mother, conversely, became increasingly strained. She blamed her mother for the divorce. According to Allison, Ashley acted out and became derisive following visits with Jim and Emmy. At one point, after having sought Emmy's advice, Ashley wrote a letter to Allison telling her, "You hurt me a lot . . . . I had to go through all that pain and stress. . . . You really need to leave Dad alone. I look out for daddy a lot just like he does for me." She warned her mother "to stay away," calling her a "loser," amid other insults. In a separate note directed to Emmy, Ashley expressed her love.

[¶9.]     Exchanges before and after visits generated the greatest friction. The children refused to cooperate, dashed in and out of the house, and locked themselves in the car. On more than one occasion, law enforcement officers had to intervene. Emmy attended these exchanges; Jim wanted her to act as a "witness." Sometimes Jim and Emmy made video recordings of the children's misbehavior on their cell phones, but Jim did little to assist Allison, declaring, "I am not going to force them

to go with you." According to Allison, Emmy and Jim would watch amused, as Allison struggled to get the children under control. On occasion, Emmy would intercede to help get the children out of the car, chiding Allison with, "I did your job again" and "Why can't you be a mother?" In court, Emmy described her supervening role: "Every single time there was a kids exchange, they would never listen to [Allison] until I stepped in after sitting and listening to them argue for over an hour." According to Jim, the children rebel against Allison because they do not like her and she is overly strict. Jim tells Allison, "Your kids don't love you, they don't want you, they don't want to be with you."

[¶10.] On one occasion when Jim told Allison that he would be bringing the children home later than was agreed, Allison went to his apartment to pick them up herself. Allison found Emmy with the children; Jim was away at a meeting. When Allison asked for her children, Emmy resisted — she "didn't feel comfortable with sending the kids with" their mother. Allison pushed her way in and took her children home. Emmy then sought and obtained a temporary protection order against Allison. The matter was dismissed at the first hearing.

[¶11.] When asked in court whether he had any concern "that Emmy [had] inserted herself in the family and tried to take over some of the roles that Allison has always done," Jim was untroubled. In his view, "that's part of moving on after a divorce when you get a boyfriend, girlfriend, new husband, wife in the picture."

[¶12.] Jim describes Allison as impulsive and volatile, based on events occurring mostly in 2008, close to the time when Allison learned Jim was having sex with a high school girl. She punched Jim during an argument and even punched

Ashley on the arm when she unintentionally hit Allison in the face with a ball. At times, according to Jim, Allison appeared mentally disturbed and self destructive. She once tried to overdose, Jim says, on antidepressants and took a disturbing interest in learning how Jim's handgun works. Ashley picked up on this theme, often calling her mother "crazy." Because Allison's relationship with Ashley was strained, and because Ashley was out of control, at times hitting and kicking her mother, Allison ultimately allowed Ashley to remain with Jim.

[¶13.]	During the first day of trial, Judge Hoffman realized that the "Emmy" involved with Jim was the same "Emmy" who played a similarly enmeshed role in another divorce case. He informed counsel in chambers and then put his disclosure on the record in court. The judge said that in the other case in which he presided, the father, a middle-aged law enforcement officer, became involved with Emmy while she was in high school. His "relationship" with her was investigated by the authorities, and he was relieved of his duties. But he persisted in the relationship, and his marriage ended as a consequence. Under these "troubling" circumstances, the judge explained, the mother received sole custody of the children, and the father's visitation was conditioned on his having "absolutely no contact with [Emmy] whatsoever when the children were in his presence."

[¶14.]	Jim's attorney requested a continuance to process this new information, and, in the meantime, the judge wanted to consider whether he should recuse himself. Four days later, Jim's counsel informally requested the judge to disqualify himself under SDCL 15-12-21.1. The judge declined the request and gave his reasons, but he invited either party to "file a formal motion" seeking his

disqualification. And he solicited "any authority or argument from counsel which would suggest that recusal is warranted under the circumstances of this case." Neither side objected nor formally sought the judge's disqualification.[1] Thereafter, the judge sent counsel a letter, reiterating his decision to remain on the case. The divorce trial continued.

[¶15.] After the trial ended, the judge issued a detailed memorandum decision and, later, findings of fact, conclusions of law, and a judgment. The judge found K.S. credible and concluded that, despite his denials, Jim had sexual relations with K.S. when she was sixteen. Allison was granted a divorce from Jim on grounds of extreme mental cruelty. She received sole custody of the children. The judge was particularly concerned with how Jim's relationship with Emmy harmed the children:

> Jim's interests in adolescent teenage girls, his rationalizing of his relationship with Emmy and its effect on the children, his boundary issues with Ashley, and his alienation behaviors are of grave concern to the court, and they pose a clear and present threat to the health and emotional well being of the Marko children. It is an understatement to say that his behaviors in disparaging the children's mother, and replacing her with their former babysitter, is poor modeling for the children. Such conduct is patently irresponsible, potentially harmful to the children's emotional make-up, and certainly undermines their ability to have a healthy and fulfilling childhood.

Jim's visitation was conditioned on the following: (1) Emmy "shall be immediately removed from Jim's apartment and shall not reside there"; (2) "during visitation,

---

1. Judicial disqualification for "personal bias or prejudice concerning a party" cannot be voluntarily waived. Code of Judicial Conduct, SDCL ch. 16-2, App., Canon 3F.

Jim shall have no contact with Emmy, meaning that she will not be physically present, nor shall she be in contact with Jim via phone, email, text, or other means"; and (3) "Jim shall not allow Emmy to have contact in any form with any of the children. . . ." If Jim failed to comply with these conditions, his visitation would be "restricted to the Family Visitation Center and supervised there until he is willing and able to so comply." Jim was ordered to pay child support, but no alimony. Allison was awarded a portion of her attorney's fees. The property division was held over for a future proceeding.

[¶16.]     Jim unsuccessfully moved for a new trial. He now appeals asserting that (1) the judge was required to recuse himself, (2) visitation was unduly restricted, and (3) there was no evidence to support a divorce on grounds of extreme mental cruelty.

## 1. Judicial Disqualification

[¶17.]     Jim argues that Judge Hoffman was obligated to disqualify himself because his participation in the previous divorce trial involving Emmy created "a reasonable basis for questioning his impartiality" and a "personal bias and prejudice." Prejudice is evident, Jim believes, from the fact that the judge unduly restricted Jim's visitation with his children in the same way he restricted visitation in the other divorce case. Jim insists that the judge retained his opinion of Emmy from the prior case and prejudicially used it in this case.

[¶18.]     We have often written that decisions to recuse lie within a judge's discretion. *See, e.g., State v. List*, 2009 S.D. 73, ¶ 9, 771 N.W.2d 644, 646-47; *Hickmann v. Ray,* 519 N.W.2d 79, 80 (S.D. 1994). But, in reality, discretion forms

only part of the decision. A judge exercises discretion in deciding whether the facts and circumstances fit within the disqualifying criteria. "Once the trial judge has answered the question affirmatively, however, he must recuse himself; that is not discretionary." Childers and Davis, *Federal Standards of Review* § 12.05, at 12-31 (3d ed. 1999). By rule, South Dakota judges must disqualify themselves on their own motion under SDCL 15-12-37: "A judge or magistrate having knowledge of a ground for self-disqualification under the guidelines established by Canon 3C [Canon 3E] shall not, unless Canon 3D [Canon 3F] is utilized, await the filing of an affidavit but *shall* remove himself. . . ." (Emphasis added.)

[¶19.] A fair trial before a fair judge is indispensable to due process. *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876, 129 S. Ct. 2252, 2259, 173 L. Ed. 2d 1208 (2009) (citation omitted). Judicial disqualification in South Dakota is guided by our Code of Judicial Conduct. Canon 3E(1) provides that "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances" of (a) "personal bias or prejudice" or "personal knowledge," (b) prior service as a lawyer in the matter, (c) economic interest, and (d) close personal relationship of relatives or parties to a proceeding. Code of Judicial Conduct, SDCL ch. 16-2, App., Canon 3E(1).

[¶20.] Canon 3E(1) encompasses two types of circumstances: (1) situations where the "judge's impartiality might reasonably be questioned," and (2) instances "including but not limited to" when rules (a) through (d) apply. *Id.* The commentary to Canon 3E(1) explains: "Under this rule, a judge is disqualified

whenever the judge's impartiality might reasonably be questioned, regardless whether any of the specific rules in Section 3E(1) apply." *Id.* The standard is an objective one, requiring disqualification where there is "an appearance of partiality . . . even though no actual partiality exists." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 108 S. Ct. 2194, 2202-03, 100 L. Ed. 2d 855 (1988) (citation omitted) (unanimously interpreting identical language in 28 U.S.C. § 455(a)); *see also Caperton*, 556 U.S. at 888, 129 S. Ct. at 2266; *Mitchell v. Class*, 524 N.W.2d 860, 863 (S.D. 1994).[2] Judicial fairness requires the appearance as well as the existence of impartiality.

[¶21.] While a judge has a duty to recuse when the canons require it, a judge also has an "equally strong duty not to recuse when the circumstances do not require recusal." *See* Center for Professional Responsibility, American Bar Association, Annotated Model Code of Judicial Conduct 187 (2004). Indeed, under South Dakota's Code of Judicial Conduct, a "judge *shall* hear and decide matters assigned to the judge except those in which disqualification is required." Code of Judicial Conduct, SDCL ch. 16-2, App., Canon 3B(1) (emphasis added). A judge's duty to hear a case discourages potential abuse of the recusal process. Disqualification "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made[.]" *Ex parte Am. Steel Barrel Co.*, 230 U.S. 35, 44, 33 S. Ct. 1007, 1010, 57 L. Ed. 1379 (1913).

---

2.  Both Canon 3E(1) and 28 U.S.C. § 455(a) provide for disqualification in any proceeding in which the judge's "impartiality might reasonably be questioned."

[¶22.] Turning to the circumstances here, we examine first whether Judge Hoffman's "impartiality might reasonably be questioned." This issue cannot be addressed from the perspective of a disappointed litigant or even from the perspective of the judge in question. Rather, the test is: would a reasonable person knowing all the facts conclude that the judge's impartiality might reasonably be questioned? *Sao Paulo State v. Am. Tobacco Co., Inc.*, 535 U.S. 229, 232-33, 122 S. Ct. 1290, 1292, 152 L. Ed. 2d 346 (2002); *Liljeberg*, 486 U.S. at 861, 108 S. Ct. at 2203.[3] A judge's own subjective view is not relevant to the "appearance of partiality" inquiry. "Judges must imagine how a reasonable, well-informed observer of the judicial system would react." *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990).

[¶23.] No authority exists for the notion that a judge's exposure to, and judgment of, a witness in another case creates the appearance of partiality. Ordinarily, a judge cannot be disqualified for views formed on the basis of what the judge learned in court. *Liteky v. United States*, 510 U.S. 540, 550-56, 114 S. Ct. 1147, 1155-58, 127 L. Ed. 2d 474 (1994). Likewise, even in cases where judges have had prior judicial exposure to parties, without more, appellate courts have ruled that this is insufficient to show that impartiality might reasonably be questioned. *United States v. Ayala*, 289 F.3d 16, 27 (1st Cir. 2002); *United States v. Parrilla Bonilla,* 626 F.2d 177, 180 (1st Cir. 1980). Every judge is called upon to form

---

3.      *See also* Leslie W. Abramson, *Appearance of Impropriety: Deciding when A Judge's Impartiality "Might Reasonably be Questioned,"* 14 Geo. J. Legal Ethics 55, 58, 72-73 (Fall 2000).

opinions on the merits of a case and often on the parties and witnesses involved, but that does not mean the judge has a prejudice or bias. Simply put, "[t]he objective appearance of an adverse disposition attributable to information acquired in a prior trial is not an objective appearance of personal bias or prejudice, and hence not an objective appearance of improper partiality." *Liteky*, 510 U.S. at 553 n.2, 114 S. Ct. at 1156 n.2. We see no objective grounds to conclude that Judge Hoffman's impartiality might reasonably be questioned.

[¶24.] Next we examine Jim's allegation that Judge Hoffman had a "personal bias or prejudice concerning a party." *See* Code of Judicial Conduct, SDCL ch. 16-2, App., Canon 3E(1)(a). Personal bias "refers to a mental attitude or disposition of the judge towards a party." *State v. Hoadley*, 2002 S.D. 109, ¶ 33, 651 N.W.2d 249, 258 (quoting *In re C.N.H.*, 998 S.W.2d 553, 560 (Mo. Ct. App. 1999)). We analyze this question in two parts: (1) whether, as a matter of subjective belief, the judge satisfied himself that he could proceed to hear the case free of bias or prejudice concerning a party; and (2) whether there was objective evidence of personal bias. Under the first part of the inquiry, Judge Hoffman made clear that he had no *personal* knowledge of any party or witness in the case. He further explained to the parties that his prior experience with Emmy while he was presiding in the other divorce case would not "have any affect upon [his] ability to fairly and impartially adjudicate the instant case involving the Markos and their children upon the merits." Thus, Judge Hoffman dutifully examined his conscience and subjectively concluded that he held no personal bias.

[¶25.]     In the second part of the inquiry, we look for an objective indication of prejudice or bias.  We presume a judge is "impartial absent a specific and substantial showing to the contrary."  *List*, 2009 S.D. 73, ¶ 9, 771 N.W.2d at 646 (citation omitted).  As we have said, a judge's ruling against a litigant (much less a witness) in another proceeding is insufficient, by itself, to disqualify that judge from presiding in a different case with the same litigant.  *See generally* Carolyn Kelly MacWilliam, *Disqualification of Judge for Having Decided Different Case Against Litigant — State Cases*, 85 A.L.R. 5th 547 (2001).  Moreover, though not determinative, an opinion stemming from a non-extrajudicial source usually requires no recusal.  *See List*, 2009 S.D. 73, ¶ 9, 771 N.W.2d at 647 (citation omitted).

[¶26.]     Some state courts take the analysis a step further, requiring disqualification if, as a result of a prior proceeding, the judge formed an opinion on facts at issue in the current proceeding, amounting to a prejudgment of the case. *See, e.g.*, *People v. Robinson*, 310 N.E.2d 652 (Ill. Ct. App. 1974) (declaring defendant's guilt from evidence heard earlier against codefendant); *People v. Gibson*, 282 N.W.2d 483 (Mich. Ct. App. 1979) (same); *see also In re George G.*, 494 A.2d 247 (Md. Ct. App. 1985).  But even under this standard, Judge Hoffman's decision to remain on the case was permissible because, unlike the judges involved in the above-cited cases, Judge Hoffman expressed no predetermined opinion on how he would decide this case.

[¶27.]     The United States Supreme Court has weighed in on this question in interpreting statutory language similar to our judicial canons.  Although judicial

rulings based on events occurring in current or prior proceedings alone almost never constitute a valid basis for disqualification, if such opinions "display a deep-seated favoritism or antagonism that would make fair judgment impossible," then recusal is required. *Liteky,* 510 U.S. at 555, 114 S. Ct. at 1157; *see also List*, 2009 S.D. 73, ¶ 9, 771 N.W.2d at 646-47. Obviously, Judge Hoffman formed an unfavorable opinion of Emmy's involvement in the prior case because he prohibited her from having contact with the children as a condition of visitation for the father. Yet the judge did not import his opinion from the former case into this one. Although he found "parallels between Jim Marko's relationships with teenage girls . . . and Emmy's relationships with middle-aged married men," the findings of fact indicate that the judge relied on the evidence produced in the Marko trial to reach his decision. And regardless of the "parallels" with the other divorce, abundant evidence existed here to gauge Emmy's problematic involvement with the Marko children. Furthermore, the judge expressed no preconceived view of Emmy's credibility as a witness. Her credibility, in fact, was hardly in issue: she admitted, even flaunted, her influence with the children.

[¶28.] Jim's proof on this question stems solely from Judge Hoffman's decision to impose restrictions on visitation similar to those imposed in the prior case. Both cases involved Emmy's entanglement with divorcing fathers and its adverse effect on the children. Although the judge in his decision briefly recited the facts from the prior case involving Emmy, the totality of evidence justifying the judge's decision came not from the prior case, but from evidence offered in this case, and much of it from the mouths of Jim and Emmy. Their self-described behavior

with Allison and the children revealed an absence of concern for the children's best interests. Unsparing in their scorn for Allison, they both spoke and behaved disparagingly of her in the presence of the children.

[¶29.] The judge found that "although Allison suffers from depression, she has sought counseling and medical care for this condition." Stress from "dealing with Jim's lack of willingness to contribute fairly to the financial support of the family, his infidelity, and his refusal to emotionally support her as a parent," the judge concluded, "may have caused her to overreact toward the children on occasions." But the judge also found that "Allison presented at trial as a sensible, calm individual who has had to deal with very difficult circumstances created by her husband's choices and conduct." Allison had been the children's primary caretaker all their lives.

[¶30.] We conclude that Jim has failed in his burden to make a substantial and specific showing that the judge held a "personal bias or prejudice." Nor is there proof of a deep-seated favoritism or antagonism by the judge, which could make fair judgment impossible. The record confirms that the case was decided on its merits, not on any bias Jim claims the judge harbored. In fact, we see no irregularity here: the judge handled the issue in a textbook manner. He immediately apprised the parties upon learning that he had a previous judicial encounter with Emmy. The commentary to Canon 3E(1) provides that even when a judge believes he or she is not disqualified but circumstances exist material to that consideration, the judge should disclose those circumstances to the parties on the record. Upon making the disclosure, Judge Hoffman granted a continuance to study whether the

circumstances required his disqualification. Then the judge issued a letter explaining to the parties why his disqualification was not warranted. We find no error or abuse of discretion. Judge Hoffman was not required to disqualify himself.

### 2. Conditional Visitation

[¶31.]    Jim next asserts that the trial court's decision to restrict his visitation by ordering him to have no contact with Emmy while his children are present "may raise constitutional implications." He contends that the court confused marital responsibilities with parental responsibilities, and put Jim "in the position where he must either abandon a constitutionally protected relationship or forego meaningful parenting time with his three children." He also contends that by allowing Ashley to live with him and Emmy, Allison acquiesced in having Emmy present when he exercised visitation.

[¶32.]    A court cannot take marital fault into account in deciding child custody, except as it may be relevant to parental fitness. *Fuerstenberg v. Fuerstenberg,* 1999 S.D. 35, ¶ 31, 591 N.W.2d 798, 809. When a court finds that a parent's lifestyle directly and adversely impacts the children, that parent's behaviors become relevant to the court's custody determination. *Id.* Here, the court found that Jim's predilection for teenage girls, "his rationalizing of his relationship with Emmy and its effect on the children, his boundary issues with Ashley, and his alienation behaviors" posed a "threat to the health and emotional well being of the Marko children." Furthermore, the court found that "Jim has brought the destabilizing influence of the children's teenage babysitter into the home as a surrogate parent and attempted to alienate the children from their mother." It is

apparent the court was considering Jim's parental fitness as it related to his relationship with Emmy, and not his marital misconduct. Moreover, a review of the court's findings of fact reveals that the court considered the factors from *Fuerstenberg* in making its determination. *See* 1999 S.D. 35, ¶¶ 22-33, 591 N.W.2d at 806-10. We review a court's custody decision for an abuse of discretion. *Maxner v. Maxner,* 2007 S.D. 30, ¶¶ 10-12, 730 N.W.2d 619, 622 (citations omitted).

[¶33.]     From the testimony at trial, the court's findings of fact, and all the record evidence, we detect no abuse of discretion in restricting Jim's visitation with his children, conditioned on his not having any contact with Emmy while his children are present. Jim's relationship with Emmy and her adverse involvement with the children was a pivotal factor in deciding visitation, but Jim seems unmindful of these concerns. Even on appeal, he persists in lauding Emmy as a "positive influence on the lives of the Marko children." At the time of trial, Emmy was nineteen and Jim was thirty-six. The record supports the trial court's finding that she had an unhealthy friendship with ten-year-old Ashley. And Emmy challenged Allison's parenting, undermining her authority and responsibility. Jim both instigated and supported this behavior so obviously harmful to his children. While Jim points to Allison's acquiescence during the pendency of the divorce in allowing Ashley to live with him with Emmy present, Allison's decision was in the face of Jim's encouraging Ashley to defy her mother. Even so, the courts have an independent duty to protect children's best interests. *Jasper v. Jasper,* 351 N.W.2d 114, 116-17 (S.D. 1984); *Williams v. Williams,* 425 N.W.2d 390, 393 (S.D. 1988).

### 3.  Extreme Mental Cruelty

[¶34.]       Jim argues that the trial court erred when it granted Allison a divorce on extreme mental cruelty.  He maintains that Allison conceded to a divorce on irreconcilable differences because her pleadings asserted such grounds.  He also claims that there was insufficient evidence to support proof of extreme mental cruelty.  SDCL 25-4-2(2).  Extreme cruelty is defined as "the infliction of grievous bodily injury or grievous mental suffering upon the other, by one party to the marriage."  SDCL 25-4-4.  Although the court's findings on this question were sparse, sufficient record evidence and our precedent support the court's conclusion. *See Tesch v. Tesch*, 399 N.W.2d 880, 883 (S.D. 1987) (wife granted divorce on her counterclaim for mental cruelty based on husband's extramarital affairs).

[¶35.]       Affirmed.

[¶36.]       GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.