#26177-aff in pt, rev in pt & rem-JKK

**2013 S.D. 15**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

RICHARD BAILEY, TRUSTEE OF
THE CURLEY AND ROSE HAISCH
CHARITABLE REMAINDER TRUST
DATED DECEMBER 7, 2002, FOR THE
TRUST AND ITS CHARITABLE
BENEFICIARIES and RICHARD
BAILEY and VICTOR SCHMITZ,
CO-PERSONAL REPRESENTATIVES
OF THE ESTATE OF ROSE HAISCH,
DECEASED, and of HOLLIS HAISCH,
a/k/a CURLEY HAISCH, DECEASED,               Plaintiffs and Appellees,

    v.

RAYMOND J. DULING a/k/a JOE
DULING, LYNNE A. DULING, PRAIRIE
WINDS REALTY, MULEHEAD RANCH,
and DULING FINANCIAL SERVICES,               Defendants and Appellants.


\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOHN L. BROWN
Judge

\* \* \* \*

ARGUED ON AUGUST 28, 2012

OPINION FILED **02/06/13**

MURRAY OGBORN
THOMAS NEVILLE of
Ogborn Mihm, LLP
Denver, Colorado

Attorneys for plaintiffs and appellees Richard Bailey and Victor Schmitz Co-Personal Representatives of the Estate of Rose Haisch, deceased, and of Hollis Haisch, a/k/a Curley Haisch, deceased.

and

JOHN C. QUAINTANCE of
Sioux Falls, South Dakota

Attorney for plaintiff and appellee Richard Bailey, Trustee of the Curley and Rose Haisch Charitable Remainder Trust dated December 7, 2002, for the Trust and its Charitable Beneficiaries.

MARK V. MEIERHENRY
WILLIAM E. BLEWETT of
Meierhenry & Sargent, LLP
Sioux Falls, South Dakota

Attorneys for defendants and appellants.

#26177

KONENKAMP, Justice

[¶1.] Plaintiffs brought suit against defendants for negligence, misrepresentation, and breach of fiduciary duties. A jury awarded plaintiffs $1,568,200, including punitive damages. Defendants appeal.

## Background

[¶2.] Lying along the Missouri river near Bonesteel, South Dakota, the Mulehead Ranch was reputed, at one time, to be one of the largest ranches in South Dakota. Hollis "Curley" Haisch grew up on the Mulehead. In the 1950s, he and his wife, Rose, bought the ranch from Curley's father. In Curley and Rose's care, the ranch flourished, allowing them to build a substantial estate. Although they had no children to whom they could pass on their wealth, they were generous to their extended family members and the surrounding communities. Their wills, executed in the 1990s, reflected a desire to leave a substantial charitable legacy.

[¶3.] In 1993, Raymond Joseph (Joe) Duling became the Haisches' financial advisor. At the time, Joe Duling owned and operated Duling Financial Services in Gregory. A realtor and broker, he also owned Prairie Winds Realty with his wife, Lynne. Joe Duling's family and the Haisches were friends. They often attended gatherings together. Joe spoke on Curley's behalf at various charitable functions. In a codicil to his will, Curley gave an option to purchase the Mulehead to Joe's father, Edward Duling (and Edward's heirs). According to Joe, Curley wanted to control who could and would own the ranch. In fact, Curley hired Attorney Rick Johnson to draft another codicil to his will declaring that neither Jack Gunvordahl nor any of his heirs could purchase it. Curley held a grudge against Jack from the

-1-

time when Curley was on the Whetstone Township Board of Supervisors, and the township was sued over road maintenance. *See Willoughby v. Grim*, 1998 S.D. 68, 581 N.W.2d 165.

[¶4.] In the 1990s, Rose's health began to decline. She was diagnosed with uterine cancer and suffered from diabetes and macular degeneration. Curley also started to slow down; he was no longer active on the ranch. Their niece, Margaret Bailey, and her husband, Rich, became their caretakers. Tom Fernau managed the ranch as Curley's hired hand. By 2000, Curley and Rose decided to move into an assisted living facility, the Haisch Haus, in Bonesteel. Joe Duling remained their financial advisor, counseling them on their wills and gifts. Joe also carried out Curley's decisions to lend money to friends and relatives.

[¶5.] When Curley was 90 years old, he decided to sell the ranch. In May 2002, he signed a listing agreement with Joe Duling, offering the property for sale at $4.8 million. At that time, the ranch comprised some 4,320 acres of pasture land, 35 acres of farmland, 350 acres of irrigated land, and 20 acres of producing gravel pit. Shortly after the listing, Curley decided to retain a life estate in the gravel pit, and reduced the listing price to $4 million.

[¶6.] Joe Duling received the first offer to purchase the property on July 24, 2002 for $3 million, including the gravel pit. Joe presented the offer to Curley, Rich Bailey, and Tom Fernau. Curley declined the offer and countered with $4 million. It was rejected. In September 2002, Joe was in Curley's room at the Haisch Haus, with Rich and Tom. Joe verbally offered Curley $1 million for the Ranch, plus $600,000 for the chattels, with an option to purchase the gravel pit for $1 million

after Curley's death. He told Curley that his offer represented all he and Lynne could afford. According to Joe, Curley decided to accept Joe's offer because Curley wanted Joe and his family to have the ranch. The offer was not reduced to writing. Additional third-party offers were received over the next several months.

[¶7.] In September 2002, Kelly Bailey, who worked for Curley as a teenager, offered $2.5 million for the ranch and chattels, excluding the gravel pit. Joe presented the offer to Curley, Rich, and Tom. Curley rejected it. According to Joe, Curley would not accept the offer because Curley believed Jack Gunvordahl was behind Kelly's financing. Curley rejected another offer in October 2002 for $2.5 million, including the gravel pit.

[¶8.] At some point after listing the ranch for sale, Joe, in his capacity as financial advisor, suggested to Curley that he and Rose form a Charitable Remainder Trust (CRT or Trust), into which the ranch and chattels could be gifted.[1]

---

1. Attorney Pat Goetzinger, a trust law expert, testified:

> The charitable remainder trust is a specialized trust. And in a charitable remainder trust what we're doing is tapping into federal tax law that allows us to be charitable, to encourage philanthropy, that encourages us to engage in philanthropic planning in return for receiving certain tax breaks, income tax breaks, gift tax breaks, federal estate tax breaks as a result of forming the trust.
> . . .
> And if it's a properly formed charitable remainder trust, one that qualifies as a tax exempt trust under federal law, good things happen. Good things happen. And one good thing that happens is that when we make a transfer of an asset to that type of a trust, a tax exempt qualified charitable remainder trust, we get a [charitable deduction.] And a charitable deduction is a good thing because we can use that charitable

(continued . . .)

Joe explained that he had learned about CRTs during a South Dakota Community Foundation (SDCF) seminar and believed it would be beneficial for the Haisches. Curley agreed.

[¶9.]     Joe hired Curley's attorney, Rick Johnson, to draft the CRT for Curley and Rose. The CRT would be called The Curley and Rose Haisch Charitable

_____

(. . . continued)

deduction to offset our other income that we would otherwise pay income tax on. So that's a good thing.

The other thing that happens when we transfer our assets to this trust is that as a result of transferring it to a charitable remainder trust, and the trust being a tax exempt entity, if the trust sells the assets in compliance with the laws set forth under the IRS tax code, then the sale proceeds of that sale will incur no income tax. It will be an income-tax-free sale; no income tax. . . .
The next component of the CRT, if I may just step up, is upon the sale, sale proceeds come into the CRT. So money comes back in, real property goes out to the buyer, money comes back in. It's not subject to tax, don't have to pay tax so I've got a hundred percent of the sale proceeds available inside this trust to be used according to the trust terms.

In a standard CRT a requirement of federal law is that you must have a non-charitable beneficiary be the income recipient of the income stream that is required to be part of these trust instruments. And the policy is the federal government wants these sale proceeds to be kicked out, put back into the stream of commerce, put back into somebody's pocket so they have to pay tax on it and then they can then turn around and spend it, consume it, use it, save it, build the next great fortune. But that's the trade-off. That's the trade-off. . . .
The earnings off the trust principal will be subject to income tax. And it's those earnings, a percentage of them, however the donor wants to direct it, but those earnings need to be kicked out and tax needs to be paid on them.

Remainder Trust dated December 7, 2002. Attorney Johnson asked two CPAs to review the draft, one being Tim Dean. Dean told Rick that there were potential defects. On November 18, 2002, Joe contacted the SDCF and spoke with Stephanie Judson, the associate director. Joe asked her if the SDCF would look at the draft. Judson agreed, and Joe sent it to her. Judson later testified that she called Joe the same day and told him she found problems with the Trust. Joe did not recall the discussion. Nonetheless, Judson sent the Trust draft to Tom Adam, counsel for the SDCF, highlighting the concerns she had. At some point thereafter, Adam, Judson, and Johnson conferred by telephone about the Trust. On December 9, 2002, Adam sent Judson a letter outlining the defects in the Trust.

[¶10.]    On December 7, 2002, in Attorney Johnson's office, with Johnson, another firm attorney, and Joe present, Curley and Rose executed the Trust, unchanged from its original draft. The Ranch was then transferred to the Trust, and Rich Bailey was named the Trustee. On December 15, 2002, Rich, as the Trustee, signed a listing agreement with Joe, making Joe the listing agent for the Trust. Then, on December 31, 2002, the Trustee signed a contract for sale and an option agreement, selling the ranch and granting an option to purchase the gravel pit to Joe and Lynne Duling. The agreement contained a provision declaring that Joe "fully explained to the Trustee and the Haischs [sic] the potential conflict of interest" he had in purchasing the property. And it was agreed that "any conflict" arising "by virtue of Duling's status as a sales broker on this property" was "waived" and "both the Trustee and the Haischs [sic] believe[d] that this sale price [was] the best offer that they [could] reasonably expect to receive in the reasonably near

future for [the] property." Before executing the contract for sale and option agreement, Joe and Lynne had already taken over control and management of the Mulehead. Closing was on March 3, 2003.

[¶11.] On April 11, 2003, Joe became the Trust's financial advisor. Also in the spring, Vic Schmitz became the Trust's CPA, and filed a tax return for 2002. At some point thereafter, he noticed defects in the Trust and informed the Trustee. No changes were made. In 2005, Schmitz involved the SDCF and attorney Pat Goetzinger. Together, with the assistance of another CPA (Michael Miranda), they identified multiple defects, namely the lack of a non-charitable beneficiary, distributions for a fixed amount rather than a percentage, and Curley's retention of a life estate in the gravel pit.

[¶12.] In 2006, the Trustee retained Attorney Jack Gunvordahl of Burke to bring suit against Joe and Lynne, Prairie Winds Realty, Duling Financial Services, and the Mulehead Ranch (defendants) on behalf of the Trust and on behalf of Rose and Curley (plaintiffs).[2] The complaint alleged negligence, negligent misrepresentation, breach of fiduciary duties, fraud and deceit, civil conspiracy, and unjust enrichment. Defendants moved for summary judgment, relying on the waiver clause in the contract for sale. At first, the circuit court granted summary judgment in part, but after plaintiffs' first motion for reconsideration and petitions for intermediate appeals were denied, the court granted plaintiffs' second motion for reconsideration in January 2011.

---

2. On March 27, 2007, Rose died. Curley died on January 15, 2009.

[¶13.] Before trial, plaintiffs learned that defendants had advertised to auction the Mulehead and its gravel pit. Joe and Lynne had not yet exercised their right under the option agreement to purchase the gravel pit. Plaintiffs' counsel sent defendants a cease and desist letter on January 21, 2011. Defendants did not respond. Attorneys Murray Ogborn and Darla J. Gabbitas prepared and signed a Request for Temporary Restraining Order and contacted Circuit Judge John Brown, to schedule a meeting the next day. In the communication, Judge Brown became aware the meeting was for a temporary restraining order (TRO), but did not know the substance of plaintiffs' request. Since he was not going to be in Pierre the next day, February 4, 2011, Judge Brown offered to meet in Rapid City, where he had another engagement.

[¶14.] The meeting took place in a conference room at Attorney Pat Goetzinger's law firm, though Mr. Goetzinger did not meet with the judge. Rather, Attorney Gabbitas traveled from Colorado for the meeting, presented the judge with the TRO request, and explained the reasons for seeking it. Ms. Gabbitas then left the room and Judge Brown reviewed the documents. Plaintiffs averred that notice was given to defendants by email on the same day, February 4. Perhaps to justify the lack of adequate notice to opposing counsel, the TRO request alleged that "Plaintiffs were not notified of this auction by the Dulings or counsel." No record was made of the meeting. After Judge Brown indicated that parts of the proposed order were unacceptable, it was amended, and he granted the TRO, prohibiting the auction sale. He ordered that a hearing for a permanent injunction be held within ten days. But the parties later settled the issue and the TRO was dismissed. On

February 15, 2011, defendants sold the Mulehead and the gravel pit at auction to Kelly Bailey for $4.6 million.

[¶15.]     Affronted by Judge Brown's ex parte meeting with plaintiffs' counsel at the law firm in Rapid City, defendants moved the judge to disqualify himself from further proceedings and to vacate his previous orders. Defendants argued that Judge Brown initiated and invited the ex parte communication, to defendants' prejudice. Plaintiffs responded that the ex parte communication was warranted under the law, that TROs are characteristically ex parte, and that defendants failed to establish prejudice. After a hearing, Judge Brown declined to disqualify himself. We denied defendants' subsequent petition for an intermediate appeal.

[¶16.]     In preparation for trial, defendants moved in limine to prevent plaintiffs from presenting evidence on what damages plaintiffs might suffer if the IRS were to take action against the Estate and Trust. The circuit court questioned the speculative nature of these damages but decided to allow the evidence nonetheless.

[¶17.]     A jury trial was held in August 2011. Multiple witnesses testified, including several experts who testified on CRTs, as well as the duties of real estate and financial advisors. Plaintiffs alleged that Joe exerted undue influence over Curley and Rose to gain ownership of the Mulehead. Plaintiffs further claimed that Joe, as the couple's financial advisor and real estate agent, breached his fiduciary duties. Moreover, plaintiffs argued that while Duling did not draft the Trust, he was aware it had defects and was negligent and breached his duties to the Estate and Trust. Plaintiffs asserted that the Trust and Estate were damaged by the (1)

unwarranted commission paid to Joe, (2) the value that would have gone to the Trust had Joe paid fair market value for the ranch, and (3) the tax consequences the Estate and Trust have incurred and will incur.

[¶18.] Defendants responded that the sale of the Mulehead to Joe and Lynne was what Curley and Rose wanted, and that, as a whole, the price they paid was fair. While Joe acknowledged he improperly charged and retained a commission on the sale of the option (the gravel pit), he did not believe he breached any fiduciary duties to Curley, Rose, or the Trust.

[¶19.] At the close of the case, defendants requested a jury instruction on the limitation periods applicable to IRS claims for unpaid taxes from estates or trusts. Defendants thought the jury should be instructed that there is a three-year, six-year, or an unlimited limitations period depending on the circumstances. The court denied the instruction. Defendants also requested an instruction on the doctrine of quasi-estoppel. Defendants argued that plaintiffs should be estopped from asserting that the Trust was defective because the Trust's CPA and Trustee took a position with the IRS from 2003 through 2011 that the Trust was valid. The court found the doctrine inapplicable.

[¶20.] In rendering its verdict, the jury completed a form finding that Joe was professionally negligent both as a real estate broker to the Estate and as a financial advisor to the Trust. It further found that Joe breached his fiduciary duties to the Haisches and the Trust, and negligently and fraudulently misrepresented facts to the Haisches, and negligently misrepresented facts to Rich Bailey, the Trustee, but did not fraudulently misrepresent facts to him. Lynne, doing business as Prairie

Winds Realty, was found vicariously liable for Joe's negligence. The jury found that Joe and Lynne Duling were unjustly enriched as a result of the sale of the ranch to them, and that Joe's wrongful acts and omissions caused harm to the Estate and Trust. The jury awarded $500,000 to the Trust, plus $568,200 in exemplary damages, and $500,000 to the Estate.

[¶21.]   Defendants appeal asserting (1) Judge Brown was required to disqualify himself because of his improper ex parte meeting with plaintiffs' counsel; (2) it was error to refuse defendants' proposed instruction on the defense of quasi-estoppel; (3) evidence of speculative tax damages was admitted in error and the court's refusal to give defendants' proposed tax damages instruction was erroneous; (4) the court erred when it held that Joe owed a duty to the Trust before its creation; (5) the court erred when it held that SDCL 15-2-14.6 and SDCL 15-2-14.7 did not apply; and (6) the court abused its discretion when it admitted evidence of previous offers on the ranch.[3]

### 1. Judicial Disqualification

[¶22.]   "A fair trial before a fair judge is indispensable to due process." *Marko v. Marko*, 2012 S.D. 54, ¶ 19, 816 N.W.2d 820, 826 (citing *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876, 129 S. Ct. 2252, 2259, 173 L. Ed. 2d 1208 (2009) (citation omitted)). Defendants contend that they were denied due process when

---

3.   A court's decision to refuse a requested jury instruction is reviewed for an abuse of discretion. *State v. Jensen*, 2007 S.D. 76, ¶ 7, 737 N.W.2d 285, 288 (citation omitted). Evidentiary rulings are reviewed for an abuse of discretion. *Ferebee v. Hobart*, 2009 S.D. 102, ¶ 12, 776 N.W.2d 58, 62 (citation omitted). Rulings on summary judgment are reviewed de novo. *Horne v. Crozier*, 1997 S.D. 65, ¶ 5, 565 N.W.2d 50, 52.

Judge Brown met ex parte with opposing counsel and then declined to disqualify himself. We have often held that recusal decisions are discretionary, but while discretion enters into the consideration, discretion forms only a part of the decision. "A judge exercises discretion in deciding whether the facts and circumstances fit within the disqualifying criteria." *Id.* ¶ 18. But once a judge answers the question affirmatively, discretion ends and the judge must step aside. *Id.* (citations omitted). By rule, judges having knowledge of a ground for self-disqualification must disqualify themselves on their own motion under SDCL 15-12-37, regardless of a request to do so.

[¶23.] Defendants maintain that Judge Brown initiated or invited the ex parte contact when he suggested a meeting in Rapid City at a law firm affiliated in this case with plaintiffs' counsel. No prejudice need be shown and recusal is mandatory, defendants argue, because Judge Brown invited or initiated the ex parte communication. *See O'Connor v. Leapley*, 488 N.W.2d 421, 423 (S.D. 1992). Defendants further contend that plaintiffs and Judge Brown could have easily given defendants notice of the meeting. It had been scheduled the day before and Attorney Gabbitas had time to fly to Rapid City from Colorado. Even if prejudice is not presumed, defendants contend, prejudice exists under the facts of this case, and the judge abused his discretion when he failed to disqualify himself. Judge Brown conceded that his TRO "may have granted some tactical advantage in [the] negotiation process" for the ultimate sale of the ranch.

[¶24.] Canon 3B(7) on ex parte communications provides in part:

> A judge shall not initiate, permit, or consider ex parte
> communications, or consider other communications made to the

> judge outside the presence of the parties concerning a pending or impending proceeding except that:
>
> . . .
>
> (e)     A judge may initiate or consider any ex parte communications *when expressly authorized by law to do so*[.]

SDCL ch. 16-2, App. Canon 3B(7) (emphasis added).  In *O'Connor,* we quoted the Nebraska Supreme Court for the proposition that prejudice is presumed whenever a judge initiates or invites an ex parte communication.  488 N.W.2d at 423 (citing *Nebraska v. Barker*, 420 N.W.2d 695, 699 (Neb. 1988)); *see also State v. Thorsby*, 2008 S.D. 100, ¶ 13, 757 N.W.2d 300, 304.  *Barker* involved an improper and unauthorized ex parte communication between the sentencing judge and the victim's family.  420 N.W.2d at 699.

[¶25.]     Here, in response to a request for a meeting to petition for a TRO, Judge Brown, because he would be in Rapid City, suggested that plaintiffs' counsel meet with him there.  South Dakota law expressly authorizes the granting of an ex parte TRO.[4]  SDCL 15-6-65(b).  While there may be instances when prejudice occurs

---

4.     SDCL 15-6-65(b) provides, in part:

> Where no provision is made by statute, a temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if:
>
> (1)     It clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and
>
> (2)     The applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice or the reasons supporting his claim that notice should not be required.

because a judge invites or initiates an ex parte communication, the circumstances here do not suggest that Judge Brown initiated the contact. *See Cook v. State*, 36 P.3d 710, 727-28 (Alaska Ct. App. 2001); *State ex rel. Irby v. Israel*, 302 N.W.2d 517, 524-25 (Wis. Ct. App. 1981); *see also United States v. Hackett*, 638 F.2d 1179, 1188 (9th Cir. 1980). Defendants argue that meeting outside his circuit with plaintiffs' counsel at a law firm affiliated with counsel for plaintiffs shows all the more how egregious his ex parte contact was. Maybe a more neutral location might have been the county courthouse in Rapid City, yet considering the conditions — his review of the documents alone in the law firm's conference room — the location seems substantively insignificant. To make disqualification imperative because a judge suggested a meeting in the community where the judge would be at the time of the sought after TRO, would be extreme and would endanger the protections SDCL 15-6-65(b) affords to parties claiming immediate and irreparable harm.

[¶26.]     Defendants maintain, however, that the ex parte communication was unwarranted because plaintiffs' compliance with SDCL 15-6-65(b) was wholly inadequate. In particular, defendants condemn plaintiffs' TRO request, in which plaintiffs failed to inform Judge Brown of the reasons notice to defendants should not be required. Indeed, our statute specifically requires attorneys to certify "to the court in writing the efforts, if any, which have been made to give the notice or the reasons supporting [the] claim that notice should not be required." SDCL 15-6-65(b)(2). That was not done. Furthermore, plaintiffs were required to submit a written undertaking. SDCL 15-6-65(c). That was not done, either. Plaintiffs simply failed to comply with the statutory requirements for a TRO. We find it

especially troubling that plaintiffs' counsel, knowing that defendants were represented, made no effort to give proper notice. This case had been ongoing for years. Plaintiffs identify no obstacles that would have prevented notice. They waited until the day of the meeting with the judge and then emailed defendants a copy of the TRO request, when plaintiffs knew the date and time of the meeting at least the day before. This was all the more problematic when there was no effort made at the time of the meeting with Judge Brown even to telephone defendants' counsel.

[¶27.]     Nevertheless, the flaws in the process and insufficiency of notice have little bearing on our review of whether Judge Brown was required to disqualify himself. Even when a TRO is improvidently granted, judicial error will not perforce become an ethics violation. Our inquiry here is not whether Judge Brown erred in granting the TRO, but whether an improper ex parte communication occurred. In hindsight, perhaps these circumstances might have suggested more circumspection on Judge Brown's part in asking why opposing counsel should not have been participating. But the fault here lies with plaintiffs' attorneys, Ogborn and Gabbitas. Their less than conscientious (if not calculating) performance had far more to do with any appearance of impropriety than Judge Brown's actions. Nothing he did amounted to a clear violation of judicial ethics requiring recusal.

[¶28.]     As to any personal bias or prejudice, Judge Brown indicated on the record at the hearing requesting his disqualification that he did not harbor any bias or prejudice against defendants. *See Marko*, 2012 S.D. 54, ¶ 24, 816 N.W.2d at 827-28; *see* Code of Judicial Conduct, SDCL ch. 16-2, App., Canon 3E(1)(a). And, from

our review of the record, we detect no "objective evidence of personal bias." *Marko*, 2012 S.D. 54, ¶ 24, 816 N.W.2d at 827. The TRO information given to Judge Brown related, not to the substance of the case, but to whether defendants should be temporarily prevented from selling the ranch. In the end, this case was tried to a jury, and the jurors were not exposed to information imparted at the ex parte meeting that could have created a risk of improper influence. *See Cook*, 36 P.3d at 728. Thus, defendants have established neither bias nor prejudice. Judge Brown's decision to decline recusal is affirmed.

### 2. Quasi-Estoppel

[¶29.] At trial, defendants proposed a jury instruction on the doctrine of quasi-estoppel. It provided that the doctrine "prohibits a party from asserting, to another's disadvantage, a claim inconsistent with a position previously taken in front of the Internal Revenue Service." Defendants asserted that Rich Bailey, as the Trustee, and Vic Schmitz as the Trust's CPA, prepared, signed, and filed tax returns with the IRS for the years 2003 through 2011, swearing that the Trust was a valid CRT, when, since at least 2006, they knew that the Trust was potentially defective. Defendants contend that while gaining the advantageous tax treatment of a valid Trust, but attacking its validity in court and asserting its potential future tax burdens, plaintiffs took inconsistent positions to defendants' disadvantage. The court denied the instruction, and defendants now contend that they were prejudiced.

[¶30.] Plaintiffs respond that the doctrine is inapplicable because defendants were not parties to the transactions they claim gave rise to the defense. Plaintiffs

cite several cases for the proposition that quasi-estoppel cannot apply unless there is mutuality of the parties. *See Warner Indep. Sch. Dist. v. Brown Cnty. Bd. of Ed.*, 85 S.D. 161, 166, 179 N.W.2d 6, 8 (1970); *see also Neiman-Marcus Grp., Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir. 1990); *Whitacre P'ship v. Boisignia, Inc.*, 591 S.E.2d 870, 892-93 (N.C. 2004). Plaintiffs further argue that defendants played an active role in suggesting the creation of the Trust, were advised it was defective, and took no steps to correct the problems. Thus, according to plaintiffs, defendants are not entitled to assert the defense.

[¶31.]        Quasi-estoppel is an equitable remedy, applicable when a party maintains a position inconsistent with a position previously acquiesced in, or of which the party accepted a benefit, and these inconsistent positions are to another's disadvantage. *Fed. Land Bank v. Houck*, 68 S.D. 449, 460, 4 N.W.2d 213, 218-19 (1942) (quoting 31 C.J.S. Estoppel § 107). The doctrine "has its basis in election, ratification, affirmance, acquiescence, or acceptance of the benefits[.]" *Id.* Intended to prevent parties from benefiting by taking two clearly inconsistent positions to avoid certain obligations or effects, the doctrine is sometimes used interchangeably with judicial and equitable estoppel, but it is more closely akin to judicial estoppel. *See, e.g., Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 704 F. Supp. 2d 177, 193 (E.D. N.Y. 2010) (discussing judicial estoppel and stating that quasi-proceedings are equivalent, i.e., the IRS); *see also Long v. Turner,* 134 F.3d 312, 318 (5th Cir. 1998). For purposes of our analysis, we borrow the principles of judicial estoppel, since it is so similar to, and perhaps analytically indistinguishable from, quasi-estoppel. Regardless of its pedigree, quasi-estoppel is an equitable doctrine,

and therefore, must be given a reasonable interpretation and applied to promote equity. *Mahoney–Buntzman v. Buntzman*, 909 N.E.2d 62, 66 (N.Y. 2009).

[¶32.] Although plaintiffs assert that privity between the parties is lacking here and there must be privity for the doctrine to apply, this view has not been uniformly adopted. "A thorough review of judicial estoppel cases from other jurisdictions reveals that three principal factors are considered by most courts in applying the doctrine: prior success, privity, and reliance or prejudice. However, even as far as these factors are concerned, the courts appear to be hopelessly split."[5] Indeed, South Dakota has never formulated the appropriate test to be applied when quasi-estoppel is raised. Yet "[a]lmost all courts recognize the distinct public policy objectives of the different estoppel doctrines and hold that privity of the parties, reliance, and prejudice, generally recognized elements of equitable estoppel, are inapplicable to the doctrine of judicial estoppel."[6]

[¶33.] The "only clear 'majority' rule requires that a party's prior inconsistent assertion be judicially adopted before judicial estoppel can be successfully invoked."[7]

---

5.     Michael D. Moberly & Laura L. Farley, *Blowing Hot and Cold on the Frozen Tundra: A Review of Alaska's Quasi-Estoppel Doctrine,* 15 Alaska L. Rev. 281, 297 (1998).

6.     Eugene R. Anderson & Nadia V. Holober, *Preventing Inconsistencies in Litigation with a Spotlight on Insurance Coverage Litigation: The Doctrines of Judicial Estoppel, Equitable Estoppel, Quasi-Estoppel, Collateral Estoppel, "Mend the Hold," "Fraud on the Court" and Judicial and Evidentiary Admissions,* 4 Conn. Ins. L.J. 589, 632-33 (1997-1998).

7.     *Blowing Hot and Cold, supra* note 5, at 297.

Sometimes called the "prior success rule," the doctrine applies to parties who have unequivocally and successfully asserted a position in a prior proceeding; thus, they are estopped from asserting an inconsistent position in a subsequent proceeding. *See Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982) (dealing with judicial estoppel). "Most circuits have refused to apply the doctrine of judicial estoppel unless the inconsistent assertion in the subsequent litigation was adopted in some manner by the court in the prior litigation." *Stevens Tech. Servs., Inc. v. SS Brooklyn*, 885 F.2d 584, 588 (9th Cir. 1989) (citations omitted). *See also Wilcox v. Vermeulen*, 2010 S.D. 29, ¶ 10, 781 N.W.2d 464, 468 (citation omitted) (judicial estoppel requires that the "earlier position was judicially accepted"). On the question of prior success, the problem with defendants' argument is that there was no resolution from the IRS on whether the Trust was valid. Plaintiffs filed annual tax returns for the Trust, but plaintiffs' experts testified that the Trust was defective, would have to be amended, and will incur adverse tax consequences as a result. There was no conclusive evidence that plaintiffs gained an advantage by filing annual returns based on the supposition that the Trust was valid. Furthermore, defendants' proposed instruction stated that the doctrine applies when a party has asserted or "taken [an inconsistent] position." This proposed instruction was incomplete. For the rule to apply, the "[p]rior success is measured . . . in terms of . . . whether a [tribunal or agency] adopted the party's original assertion."[8] Merely advancing an earlier inconsistent position is not enough. There had to have been some showing that the IRS adopted the validity of the Trust in

---

8.      *Blowing Hot and Cold, supra* note 5, at 297.

receiving the annual returns.  Therefore, equity does not demand the application of quasi-estoppel in this case.

### 3. Tax Damages and Instruction

[¶34.]        Defendants argue that the court abused its discretion when it admitted evidence related to the tax consequences plaintiffs might suffer as a result of the defects in the Trust.  In defendants' view, the tax damages sought by plaintiffs were speculative, contingent, and uncertain because the IRS had not taken action against the Estate or Trust, never informed the Estate or Trust that deficiencies existed, and never opined that the Trust was defective.  Plaintiffs, on the other hand, argue that they have already suffered certain tax damages as a result of the defective Trust.  Moreover, they rely on testimony from their tax experts that the Trust will be rescinded at some point in the future, which could expose the Trust and Estate to adverse tax consequences.

[¶35.]        Once the fact of damages has been established, uncertainty over the amount of damages is not fatal to recovery.  *Weekley v. Prostrollo*, 2010 S.D. 13, ¶ 24, 778 N.W.2d 823, 830.  Damages are speculative, not when the amount is uncertain, but when the fact of damages is uncertain.  *Id.*  Here, plaintiffs have established the fact they have been damaged, and the amount, but only as it relates to some tax consequences.  Plaintiffs presented evidence that the Estate filed an amended return and paid $35,000 in back income taxes because the Trust was defective.  Witnesses also testified that as a result of the defective Trust, plaintiffs have incurred $29,000 in accounting fees and $53,600 in legal fees to correct the errors.  One expert testified that the defective Trust caused plaintiffs to lose the

benefit of charitable contribution deductions, totaling $121,000. These amounts were not speculative, contingent, or uncertain.

[¶36.]     On the other hand, the tax consequences plaintiffs might face if the Trust were rescinded are speculative and contingent. Plaintiffs' witnesses testified about what the IRS *might* do *if* the IRS were to take action against the Estate and Trust. They also said the IRS might take no action, meaning the Estate and Trust would face no tax consequences. Any award rooted in what the IRS *might* assess *if* the Trust is rescinded is a prospective damages award, based on future events that may or may not occur. It is not like future unknown medical expenses in a personal injury action, in which one has the *fact* the plaintiff is injured. Here, the *fact* of damages (injury) is predicated on a hypothetical event, IRS action. The IRS might never assess arrearages, penalties, or impose other consequences as a result of the defective Trust, and therefore, plaintiffs will not be harmed. Due to the speculative, contingent, and uncertain nature of these damages, the court should have excluded this evidence.

[¶37.]     As to potential future tax consequences, defendants requested an instruction on the controlling limitation periods for when the IRS may seek money from plaintiffs in connection with defects in the Trust. Defendants claim their proposed instruction is a valid statement of the law.[9] The applicable limitation

---

9.     The proposed instruction provided: "The Internal Revenue Service must assess a tax or attempt to collect unpaid taxes and penalties within three years after a return is filed. In cases of fraudulent or criminal conduct by a taxpayer, the Internal Revenue Service may collect unpaid taxes within six years. These limitation periods begin to run the day after the taxpayer files a return." In addition, during settlement of instructions, defendants conceded

(continued . . .)

periods could have precluded some or all of plaintiffs' future tax consequences. Without an instruction on these limitation periods the jury could have concluded that plaintiffs' exposure to future losses would be indefinite. Plaintiffs' own experts could not agree on when the applicable limitation periods expired. Ordinarily, statutes of limitation questions are for juries to resolve. *One Star v. Sisters of St. Francis, Denver, Colo.*, 2008 S.D. 55, ¶ 12, 752 N.W.2d 668, 675 (citations omitted). The circuit court erred in failing to give a proper instruction on the statutes of limitation applicable to plaintiffs' claims for future tax consequences.

### 4. Duty to the Trust

[¶38.] Before trial, defendants moved for summary judgment on the Trust's claims against Joe Duling "as a financial advisor for the [Trust]." Defendants note that the Trust did not exist until December 7, 2002, and therefore, Joe and the Trust had no professional relationship and Joe owed no duty to the Trust. Indeed, Joe owed no legal duty to the Trust until its creation. Plaintiffs presented evidence, however, that Joe knew the Trust had problems, both before and after its creation, and did nothing to inform the Trustee. If the jury believed this evidence, the jury could have found Joe liable based on acts occurring *after* the Trust's creation. Moreover, Joe's actions, statements, and undertakings before the creation of the Trust are relevant to prove whether he breached his duties to the Trust after December 7, 2002.

_____

(. . . continued)
> that a clause would have to be added to the instruction dealing with the limitation period applicable if no return had been filed. Even with this addition, the circuit court disallowed the instruction.

### *5. SDCL 15-2-14.6 and SDCL 15-2-14.7*

[¶39.]     Defendants assert error when the court refused to grant them partial summary judgment on plaintiffs' real-estate based claims because plaintiffs failed to bring their action against defendants within three years of any occurrence of malpractice, error, omission, or mistake. *See* SDCL 15-2-14.6; SDCL 15-2-14.7. Defendants argue that because the Haisches transferred the ranch to the Trust on December 7, 2002, the latest date the Estate could have brought suit against defendants was December 7, 2005. Defendants also assert that they owed no realtor duty to the Trust after it was sold to Joe, which was on March 3, 2003. Defendants finally contend that the continuous professional representation doctrine cannot be used to extend the limitations period for the realtor-based claims.

[¶40.]     SDCL 15-2-14.6 provides that "[n]o action may be brought against a licensed real estate broker . . . for malpractice, error, mistake, or omission, . . . unless it is commenced within three years of the occurrence of the alleged malpractice, error, mistake, or omission. This section is prospective in application." SDCL 15-2-14.7 applies the same period to a broker's real estate company. However, the intent of the Legislature is clear: "This section is prospective in application." SDCL 15-2-14.6 and SDCL 15-2-14.7 were enacted on February 25, 2004. Plaintiffs' claims against defendants for Joe's actions as a real estate agent accrued between May 2, 2002, when Curley signed a listing agreement with Joe, and March 7, 2003, the date the ranch was sold to Joe by the Trust. SDCL 15-2-14.6 and SDCL 15-2-14.7 were not in effect at that time, and therefore, did not apply.

### 6. Evidence of Previous Offers

[¶41.]     Defendants argue that previous offers received for the Mulehead were inadmissible to show the value of the ranch.  Evidence of past offers does not establish the fair market value of property.  *In re Dissolution of Midnight Star Enterp.*, 2006 S.D. 98, ¶¶ 19-22, 724 N.W.2d 334, 338-39.  But plaintiffs presented evidence of the previous offers to prove Joe breached his duties to the Estate and Trust.  This evidence demonstrated that the Haisches received offers for considerably more than that offered by Joe, that Joe knew what Curley could have received for the sale of the ranch and gravel pit, and that Joe did not have Curley's best interests in mind while acting as his real estate agent and financial advisor.  One prospective buyer, Mert Lund, testified that when he suggested to Joe that he (Lund) was willing to pay the asking price of $4.8 million, Joe Duling responded, "Oh God, you don't want to do that.  I can get it for you for cheaper than that."  For these purposes, the evidence was admissible.

[¶42.]     Affirmed in part, reversed in part, and remanded for a new trial on damages.

[¶43.]     GILBERTSON, Chief Justice, and ZINTER and SEVERSON, Justices, and GIENAPP, Retired Circuit Court Judge, concur.

[¶44.]     GIENAPP, Retired Circuit Court Judge, sitting for WILBUR, Justice, disqualified.