#27036, #27042, #27113, #27121-aff in pt & rev in pt-JMK

**2016 S.D. 15**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JAMES ANTHONY O'NEILL,                     Plaintiff and Appellant,

v.

RICHARD DEAN O'NEILL,                      Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
BENNETT COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE KATHLEEN F. TRANDAHL
Judge

* * * *

MICHAEL A. HENDERSON
SCOTT R. SWIER of
Swier Law Firm, Prof. LLC
Avon, South Dakota                         Attorneys for plaintiff
                                           and appellant.


CLINT L. SARGENT
RALEIGH E. HANSMAN of
Meierhenry Sargent LLP
Sioux Falls, South Dakota                  Attorneys for defendant
                                           and appellee.


* * * *

                                           ARGUED ON
                                           OCTOBER 6, 2015

                                           OPINION FILED **02/24/16**

KERN, Justice

[¶1.]        James Anthony O'Neill (Tony) requested the circuit court equitably divide the assets of corporations he owns jointly with his brother, Richard Dean O'Neill (Rick).  Rick counterclaimed, seeking the enforcement of agreements dividing the corporate land and equipment.  Tony appeals the circuit court's imposition of punitive damages against him, the court's denial of his request for disqualification, the court's decision to hold him in contempt, and several of the court's factual findings.  We reverse the circuit court's award of punitive damages and affirm the other issues presented.

## Facts and Procedural History

[¶2.]        Tony and Rick are co-owners of farming and ranching operations in Bennett County, South Dakota.  Although Tony and Rick have farmed and ranched together since 1988, the brothers formally created two corporations in 1996: O'Neill Farms, Inc., and O'Neill Cattle Company, Inc. (the Corporations).  Tony is the president, treasurer, and a director of O'Neill Cattle Company; Rick is the vice president, secretary, and a director.  Rick is the president, treasurer, and a director of O'Neill Farms; Tony is the vice president, secretary, and a director.  Each brother is a 50% shareholder in each corporation.  The corporations have been in operation since 1996 but have not written by-laws, held formal meetings, or kept corporate records of any kind.  Furthermore, there were no written agreements in place to control the distribution of corporate assets in the event of dissolution.

[¶3.]        The corporations held assets including land and equipment.  The real estate held by the Corporations is largely organized in three sets: the Danielski

property, the Byrnes place, and the Jacquot place. The Danielski property consists of three quarter sections of land, each equipped with an irrigation pivot. The parties, operating as a partnership, purchased the Danielski property in 1991. The Byrnes place consists of two quarter sections of land. Each quarter section is equipped with an irrigation pivot. Tony purchased this property in 1995. The property also included a house where Rick and his wife, Kari, resided. Rick remodeled the home over the span of 2007 to 2011. The property, which is also referred to as the Headquarters, includes worker housing, storage buildings, barns, tree groves, corrals, 200,000 bushels of grain storage, and livestock feeding facilities. After the Corporations were formed in 1996, Tony and Rick transferred the five quarter sections of land contained in the Danielski property and the Byrnes place to O'Neill Farms. The parties' cattle were transferred to O'Neill Cattle Company. In 1999, O'Neill Cattle Company purchased the Jacquot place, which consisted of seven quarter sections of land and an additional 37 acres. Only two of the seven quarter sections were initially equipped with irrigation pivots, but the parties subsequently installed irrigation pivots on two additional quarter sections. The five quarter sections of land constituting the Danielski and Byrnes properties are more productive than the land included in the Jacquot place.

[¶4.] Although Tony and Rick contemplated dissolution as early as 2008, Tony did not approach Rick about dissolving their businesses until 2011. The brothers had not previously agreed in writing on how to divide the corporate property, but they generally determined that they would divide the land first, then equipment, leases of their father's land, cattle, tools, and then remaining assets and

debt. The parties met on multiple occasions in the spring and summer of 2011 to discuss the division of assets. Rick's notes from these meetings, which the circuit court found credible, indicate the parties met in July 2011 and preliminarily divided the corporate real property into two groups. The parties determined that Tony would draft a proposed agreement and that Rick would get first choice between the resulting options.[1] The parties met again on August 16, 2011, at Rick's home. Nobody else was present at this meeting.

[¶5.]     The brothers never reached a complete agreement on the division of corporate assets, and Tony initiated a lawsuit in February 2012 asking the circuit court to divide the assets of O'Neill Cattle Company and O'Neill Farms. Rick counterclaimed, seeking a preliminary injunction, the enforcement of asset-separation agreements, and a corporate accounting. Specifically, Rick produced a copy of a land-separation agreement (LSA) appearing to bear the signatures of both parties. According to the terms of the LSA, the parties purportedly agreed on August 16, 2011, to divide the Corporations' real property. Tony would receive the Byrnes place with all of its facilities—including Rick and Kari's newly remodeled home and three of the five irrigated, high-production quarter sections. Rick would receive the Jacquot place, including two irrigated, high-production quarter sections, four irrigated, poor-production quarter sections, and three nonirrigated quarter sections of pasture land. Tony asserted his signature was forged on the LSA, and he produced an alternate version at trial. The parties met again in December 2011

---

1.     Both Tony and Rick testified that they typically employed this method for resolving disputes.

and signed an equipment-separation agreement (ESA) witnessed by their father, Dean O'Neill. Although Tony asserts his signature on the LSA was forged, Kari testified that she saw a copy of the signed agreement in August 2011. Dean also testified that he saw a signed copy of the agreement in September 2011. According to Dean, Tony told him that he had drafted the LSA and that Rick made his choice. The circuit court found both Kari and Dean were credible witnesses and concluded that Tony perjured himself by denying that he signed the LSA. Believing it was required to report the commission of a felony,[2] the court reported Tony's perjury to the Sheriffs and State's Attorneys in Bennet and Tripp Counties on November 4, 2013—the same day the court finalized its findings of fact and conclusions of law. On December 3, 2013, Special Agent Jeff Goble contacted the court to discuss the investigation.[3]

[¶6.]        The court enforced the LSA and the ESA and divided the remaining assets in an order dated December 23, 2013. Although the court dismissed Rick's shareholder derivative actions, the court also ordered Tony to pay $450,000 in punitive damages to the two corporations. Among other things, the court's order required the parties to formally transfer ownership of the corporate real property, according to the terms of the LSA, within one week from the date of the order. Despite requiring the immediate execution of these transfers, the court nevertheless

---

2.    When committed during a proceeding other than a trial for a felony offense, perjury is a Class 5 felony. SDCL 22-29-5. Any person who has knowledge of the commission of a felony is required to report the same. SDCL 22-11-12.

3.    Special Agent Goble is an investigator with the South Dakota Division of Criminal Investigation.

purported to retain jurisdiction. In a letter dated March 18, 2014, the court indicated that the parties agreed that the court should retain jurisdiction while the tax consequences of the prospective transfers were being determined. The court also indicated that it learned after the trial that both Tony and Rick had taken loans from the corporations.

[¶7.]     Tony refused to comply with the court's order, and Rick asked the circuit court to hold Tony in contempt. The court held a contempt hearing on March 13, 2014, and held Tony in contempt for not removing his cattle from land awarded to Rick in the property division. The court assessed a fee against Tony of $500 per day dating back to December 31, 2013. At the hearing, the circuit court repeated its belief that Tony had committed perjury. The court also scheduled a second contempt hearing for March 27, 2014. After the March 13 contempt hearing, Tony asked the circuit court to disqualify itself from further proceedings based on the court's statements regarding Tony's truthfulness. The court denied Tony's motion. Tony then filed a notice of appeal on March 21, 2014, prior to the second contempt hearing. Despite the notice of appeal, the circuit court continued to hold hearings in the matter. Tony later filed a second notice of appeal regarding the circuit court's activity subsequent to Tony's first notice of appeal.

[¶8.]     Tony appeals, raising five issues:

1.     Whether the circuit court erred by finding the land-separation agreement was credible and entitled to enforcement.

2.     Whether the circuit court erred by finding that the $149,514.93 crop-insurance payment was not a corporate asset of O'Neill Cattle Company.

      3.      Whether the circuit court erred by awarding punitive damages to the corporations.

      4.      Whether the circuit court had jurisdiction to hold the contempt hearings.

      5.      Whether the circuit court erred by denying Tony's request for disqualification.

## Standard of Review

[¶9.]      We review a circuit court's findings of fact for clear error. *Gartner v. Temple*, 2014 S.D. 74, ¶ 8, 855 N.W.2d 846, 850. "The question is not whether this Court would have made the same findings that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed." *Id.* (quoting *Estate of Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d 219, 222). We review a circuit court's conclusions of law de novo. *Id.*

[¶10.]      "The credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the circuit court and we give due regard to the circuit court's opportunity to observe the witnesses and the evidence." *McCollam v. Cahill*, 2009 S.D. 34, ¶ 6, 766 N.W.2d 171, 174 (quoting *In re Estate of Pringle*, 2008 S.D. 38, ¶ 18, 751 N.W.2d 277, 284).

## Analysis and Decision

[¶11.]      ***1.      Whether the circuit court erred by finding the land-separation agreement was credible and entitled to enforcement.***

[¶12.]      Tony asserts the circuit court's finding that Tony signed the LSA is clearly erroneous. According to Tony, the agreement Rick produced at trial was a forgery and "contained a nonsensical division of land[.]" Tony's expert witness, Ms. Tweedy, a forensic document examiner, testified that she believed Tony's signature

had been falsified because it was misaligned with the rest of the document. The circuit court entirely disregarded Ms. Tweedy's testimony because, in the court's view, her conclusion was inconsistent with the other evidence presented. Because Tony views his expert's testimony as "compelling," he concludes that the circuit court erred by enforcing the land-separation agreement. We do not agree.

[¶13.] The circuit court made a number of other findings and credibility determinations that support its decision. The court found that Tony and Rick agreed at their July 2011 meeting that Tony would prepare a proposed division of the corporate real estate. The court found that Tony presented Rick with the proposal at a meeting on August 16, 2011, that Rick made his choice, and that Tony then completed the document in his handwriting. Although Tony claimed he presented Rick with a different proposal than that expressed in the LSA, the circuit court found Tony's testimony not credible. In contrast, the court did find credible both Kari's testimony that she saw the signed LSA in mid-August 2011 and Dean's testimony that he saw the signed agreement in Rick's home in September 2011. Even more compelling, the court found credible Dean's testimony that he spoke with Tony about the LSA at the December 2011 meeting when he witnessed Tony and Rick sign the ESA. According to the court's findings of fact, Tony told Dean "that he's a livestock and cattle buyer and that he only needed the three quarters and the big feedlot to run cattle." Tony also told Dean that he proposed the division of real estate memorialized in the LSA.

[¶14.] The behavior of the parties also supports the circuit court's finding. After their meeting, Rick hired an attorney to draft the deeds required by the LSA.

Before these deeds were completed—and at Tony's urging—Rick and Kari moved out of their newly remodeled home located on the Byrnes Place and into a mobile home located on the Jacquot Place. Because the main residence on the Jacquot Place was virtually uninhabitable, Rick and Kari purchased a new modular home for the property using personal funds and $80,000 borrowed from Dean. Later, in January or February 2012, Tony informed Rick and Kari that he disputed signing the LSA. The circuit court found that Rick's and Kari's actions were consistent with their testimony in that they moved out of their home on the Byrnes Place and purchased a new home for the Jacquot Place in reliance on the LSA.

[¶15.] Rick also produced expert testimony to support the authenticity of the LSA. Mr. Meinke, a computer forensics expert, examined Tony's computer. He found a file on Tony's computer, saved in a folder titled "Tony's documents," almost identical to the LSA. The circuit court found that the date and time stamp on the file are consistent with Rick's testimony. Mr. Meinke also located a file identical to the land-separation agreement Tony claims he provided to Rick on August 15, 2011. However, Mr. Meinke determined Tony's version had been created on October 28, 2011, 73 days after the August 2011 meeting between Tony and Rick.

[¶16.] Another of Tony's expert witnesses, Mr. Rinehart, testified that the procedure to alter the date and time stamps on a file requires a 14-step procedure. The circuit court found that "[t]here is no credible evidence that Rick used Tony's computer at any time" or that "either Tony or Rick has the technical skills necessary to conjure up the fourteen steps necessary to change the date stamps on a document." Mr. Meinke also offered an alternative explanation for the

-8-

misalignment of Tony's signature. According to Mr. Meinke, the copy of the LSA that Ms. Tweedy examined was the scanned image of a copy of a copy of an original document produced on a low-end printer. According to Mr. Meinke, it is more probable that the misalignment of Tony's signature resulted from this copying process.

[¶17.]        We are not convinced the circuit court erred. Tony does not assert the foregoing findings are clearly erroneous—i.e., "contrary to a clear preponderance of the evidence." *Gartner*, 2014 S.D. 74, ¶ 8, 855 N.W.2d at 850 (quoting *Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d at 222). Instead, Tony's argument is essentially that the circuit court should have given greater weight to his expert's testimony. "We have often said that 'this Court is not free to reweigh the evidence or gauge the credibility of the witnesses.'" *Waldner v. Berglund*, 2008 S.D. 75, ¶ 19, 754 N.W.2d 832, 836-37 (quoting *Miller v. Hernandez*, 520 N.W.2d 266, 272 (S.D. 1994)). "Fact finders are free to reasonably accept or reject all, part, or none of an expert's opinion." *Sauer v. Tiffany Laundry & Dry Cleaners*, 2001 S.D. 24, ¶ 14, 622 N.W.2d 741, 745. As the factfinder in this case, the circuit court was free to find that the foregoing evidence outweighed Ms. Tweedy's testimony. Because the evidence does not suggest that the circuit court's relevant factual findings are clearly erroneous, the court did not err by discounting Ms. Tweedy's testimony.

[¶18.]        ***2.        Whether the circuit court erred by finding that the $149,514.93 crop-insurance payment was not a corporate asset of O'Neill Cattle Company.***

[¶19.]        In his counterclaim, Rick asked the circuit court to issue a preliminary injunction providing for the management of corporate assets during the pendency of litigation. Although not included in the preliminary injunction as issued, at the

hearing the circuit court advised the parties it would not "allow the corporations to lease any of Dean's property. They can custom-farm and work out with Dean individually and get paid for the work that they do."[4] At trial, the evidence established that Rick endorsed, as an agent of O'Neill Cattle Company, a crop-insurance payment issued in December 2012 in the amount of $149,514.93. Tony also introduced another check written from Rick to Dean in May 2013 in the amount of $108,000. The memo line of the May 2013 check includes the words *operating loan*, *fert.*, *seed*, and another word that might be *lease*. Thus, Tony concludes that Rick violated the circuit court's verbal order, leased land from Dean, and appropriated a corporate asset by signing over the December 2012 crop-insurance payment to Dean. The circuit court rejected Tony's claim, finding that "Rick did not violate this court directive when he did custom work for Dean. Tony is not entitled to one-half of the crop loss check dated December of 2012 because that crop loss check is not a corporate asset."[5]

[¶20.]     We are not convinced that the circuit court's determination that the crop-insurance payment was not a corporate asset is "contrary to a clear preponderance of the evidence." *Gartner*, 2014 S.D. 74, ¶ 8, 855 N.W.2d at 850 (quoting *Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d at 222). The circuit court, sitting as

---

4.     During the trial, the circuit court clarified the intended meaning of this order: "What I meant was I can't tell them who to do business with."

5.     The circuit court included this finding in its conclusions of law. However, whether Rick performed custom work for Dean is a question of fact entitled to deference on review.

the factfinder, was presented with a plausible, alternative explanation to Tony's.

The following discussion occurred during the redirect examination of Rick:

> **[Rick's Counsel]**: So there's no confusion, did you lease any of your Dad's farm ground for the 2012 crop year?
>
> **[Rick]**: No.
>
> **[Rick's Counsel]**: Have you leased any your of [sic] Dad's farm ground for the 2013 crop year?
>
> **[Rick]**: No.
>
> **[Rick's Counsel]**: Exhibit 105 is a check for crop insurance that was talked about that you endorsed; is that right?
>
> **[Rick]**: Yes.
>
> **[Rick's Counsel]**: And what did you do with that check after you endorsed it?
>
> **[Rick]**: I give it to my father, because the biggest portion of it went towards his farm.
>
> **[Rick's Counsel]**: You said that the crop insurance, when you signed up for it, it had been signed up all in the name of O'Neill Cattle Company; is that correct?
>
> **[Rick]**: Correct.
>
> **[Rick's Counsel]**: When did you have to sign up for it?
>
> **[Rick]**: I think the deadline is March 31st, when you have to sign stuff. And I'm new at crop insurance. I did the FSA stuff, but I'm new at crop insurance, but I believe that's how it was.
>
> **[Rick's Counsel]**: So, you would have signed up for the 2012 crop year before March 31st of 2012?
>
> **[Rick]**: I believe so, yes.
>
> **[Rick's Counsel]**: Is that why, then, all of the crop stuff was in the name of O'Neill Cattle Company?
>
> **[Rick]**: It had to be, yeah; yes.
>
> **[Rick's Counsel]**: Now, the corporation portion of crop insurance, some of that money in that big check was to go to the corporation, correct?
>
> **[Rick]**: Correct.
>
> **[Rick's Counsel]**: And is that the check that Dean wrote back to you that's listed on Exhibit VV?
>
> **[Rick]**: Yes.

> **[Rick's Counsel]**: So, looking at the second page of Exhibit VV, which check is that?
>
> **[Rick]**: Reimbursement for crop insurance.
>
> **[Rick's Counsel]**: And the amount of—.
>
> **[Rick]**: $28,300.
>
> **[Rick's Counsel]**: So, that would be the portion to go to the corporation out of that larger [crop-insurance] check that was Exhibit 105?
>
> **[Rick]**: Yes, and the premiums were deducted from that also; or some of the premiums.

In other words, Rick asserted that the insurance policy was taken out prior to the circuit court's oral order that the corporations not lease Dean's land and that the portion of the crop-insurance check applicable to corporate crops was paid into the corporation. Tony has not met his burden of showing this finding was clearly erroneous. Therefore, the circuit court did not err.

[¶21.]     **3.     *Whether the circuit court erred by awarding punitive damages to the corporations.***

[¶22.]     Tony asserts the circuit court erred by imposing punitive damages against him in three ways. First, Tony argues that "because the [circuit] court ruled against Rick on his shareholder derivative action, there was no underlying tort claim upon which an award of punitive damages could be based." Second, Tony asserts that punitive damages may not be imposed in the absence of an award of compensatory damages. Third, Tony argues it is improper to award punitive damages to a nonparty corporation. Although Rick acknowledges that the circuit court did not award compensatory damages, he asserts the court nevertheless found that Tony injured the corporations. According to Rick, the punitive damages award was simply part of the court's "equitable division of the parties' assets and debts in

recognition of the harm Tony caused to the corporations." We agree with Tony on each point raised.

[¶23.] In reviewing awards of punitive damages, "[w]e have 'consistently held that punitive damages are not allowed absent an award for compensatory damages.'" *Hoaas v. Griffiths*, 2006 S.D. 27, ¶ 18, 714 N.W.2d 61, 67 (quoting *Schaffer v. Edward D. Jones & Co.*, 521 N.W.2d 921, 928 (S.D. 1994)). The same restrictions apply to punitive damages regardless of whether the predicate action is pursued in law or equity. *See Black v. Gardner*, 320 N.W.2d 153, 161 (S.D. 1982) ("[T]he better rule would be that we should look to the substance of the predicate action for a determination of whether punitive damages should be permitted."). Rick has offered no compelling reason to depart from this firmly established principle, and we decline to do so. In this case, the circuit court did not award Rick compensatory damages. Therefore, the circuit court erred by awarding Rick punitive damages.

[¶24.] There is an additional analytical problem implicated by awarding punitive damages in the absence of compensatory damages. SDCL 21-1-3 requires that "[d]amages must in all cases be reasonable[.]" In reviewing an award of punitive damages for reasonableness, "[t]he first factor to be considered is the amount of compensatory damages and its relationship or ratio to the amount of punitive damages. The amount of punitive damages *must* bear a reasonable relationship to the compensatory damages." *Grynberg v. Citation Oil & Gas Corp.*, 1997 S.D. 121, ¶ 38, 573 N.W.2d 493, 504 (emphasis added). When there is no compensatory award, there necessarily cannot be a relationship between

compensatory and punitive damages—let alone a reasonable one—as there is no way to calculate a ratio between the two using a nonexistent compensatory award. In the present case, the circuit court did not award compensatory damages to Rick, and the court's conclusions of law indeed fail to address this required factor. Thus, not only is an award of punitive damages in the absence of a compensatory award explicitly contrary to our past decisions, it is also logically incompatible with our framework for determining the reasonableness of punitive awards.

[¶25.]    The circuit court's error is even more fundamental here because this case presents no vehicle for punitive damages. There is no independent cause of action for punitive damages in South Dakota. *Berry v. Time Ins. Co.*, 798 F. Supp. 2d 1015, 1022 (D.S.D. 2011) (citing *Schaffer*, 521 N.W.2d at 928 (S.D. 1994)). Punitive damages are not available unless a tort has been committed. *Grynberg*, 1997 S.D. 121, ¶ 23, 573 N.W.2d at 501-02. The only torts alleged in Rick's counterclaim were his shareholder-derivative actions for breach of fiduciary duty and conversion. However, the circuit court concluded both that Rick waived his shareholder-derivative claims and that the same were inappropriate because Rick could have pursued those claims directly. Consequently, no torts remained upon which punitive damages might have been appended.

[¶26.]    Moreover, the punitive award in this case would be inappropriate even if the circuit court had awarded compensatory damages to Rick. Although Tony and Rick are the sole owners of the two corporations, neither corporation is itself a party to this dispute. The United States Supreme Court has remarked that "the Constitution's Due Process Clause forbids a State to use a punitive damages award

-14-

to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation." *Philip Morris USA v. Williams*, 549 U.S. 346, 353, 127 S. Ct. 1057, 1063, 166 L. Ed. 2d 940 (2007). The Supreme Court continued:

> [W]e can find no authority supporting the use of punitive damages awards for the purpose of punishing a defendant for harming others. We have said that it may be appropriate to consider the reasonableness of a punitive damages award in light of the potential harm the defendant's conduct could have caused. But we have made clear that the potential harm at issue was harm potentially caused *the plaintiff*.

*Id.* at 354, 127 S. Ct. at 1063. In the present case, the circuit court entered 34 conclusions of law on the topic of punitive damages. It is clear from a review of these conclusions that the court based the punitive-damage award on Tony's conduct in relation to the corporations. In doing so, the court impermissibly "use[d] a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." *Id.* at 355, 127 S. Ct. at 1064. The fact that the court not only based the punitive award on harm to third parties but also ordered Tony to pay the award to those third parties does nothing to remedy the due process concerns articulated by the Supreme Court.

[¶27.] Rick's assertion that the punitive damages award was merely a part of the circuit court's equitable division of corporate assets is not supported by the court's findings and conclusions. First, the circuit court itself characterized the award as punitive damages rather than an equitable division of property. The court entered its 34 conclusions of law on the topic of punitive damages under the heading "Punitive Damages." Second, it is clear from a review of these conclusions that the court awarded punitive damages because it concluded Tony breached fiduciary

duties to both O'Neill Cattle Company and O'Neill Farms. These conclusions discuss the nature of Tony's alleged breaches of fiduciary duties in the context of the legal standard for considering an award of punitive damages—i.e., "a reasonable basis to believe that there has been willful, wanton or malicious conduct[,]" SDCL 21-1-4.1—not in the context of an equitable division of corporate assets. Third, the court specifically concluded "that the division of corporate land, equipment, cattle and other assets and debts resulted in the equitable division of the assets" of O'Neill Farms and O'Neill Cattle Company. The court *then* proceeded to conclude that "[e]ven with the equitable division of the corporate assets between these two corporations, Tony's actions of using corporate credit to guarantee ultra vires loans, leaves both corporations potentially liable for $4,440,263.74[.]" The court then awarded the $450,000 punitive damages because of this potential harm.

[¶28.]     The circuit court erred by awarding punitive damages in this case because there was no compensatory award, no underlying tort claim, and the punitive award was both based on harm to nonparties and paid to nonparties. Therefore, we reverse on this issue and strike the portion of the circuit court's order relating to punitive damages.

[¶29.]     ***4.      Whether the circuit court had jurisdiction to conduct the contempt hearings.***

[¶30.]     Tony asserts the circuit court erred by holding him in contempt for two reasons. First, Tony asserts that the December 23 order was an appealable judgment and that the circuit court's refusal to recognize it as such deprived him of his "statutory right to obtain appellate review and to preserve the status quo by superseding enforcement of the judgment." Second, Tony asserts Rick's motion for

contempt was improperly supported by his attorney's affidavit. In response, Rick asserts that counsel for both parties mutually agreed that the December 23 order should not be a final judgment and that, as a consequence, Tony did not have a right to appeal. Rick also asserts that Tony's attorney accepted the statements made in Rick's attorney's affidavit and cannot now challenge its validity. We determine that Rick's jurisdictional argument is not persuasive and that the question whether the December 23 order was appealable is moot because Tony failed to take the steps necessary to stay execution of that order.

[¶31.]     As an initial matter, we are not persuaded by Rick's assertion that a circuit court's jurisdiction may be preserved directly by the agreement of the parties. Rick offers no authority in support of this argument; consequently, the argument is waived. *See* SDCL 15-26A-60(6); *Grant Cty. Concerned Citizens v. Grant Cty. Bd. of Adjustment*, 2015 S.D. 54, ¶ 24, 866 N.W.2d 149, 158. Contrary to Rick's argument, parties "cannot confer subject matter jurisdiction by agreement, consent, or waiver." *Cutler-Christians v. Christians*, 2001 S.D. 104, ¶ 9 n.2, 633 N.W.2d 176, 178 n.2. Additionally, the circuit court explicitly labeled the December 23 order "interim" and purportedly retained jurisdiction on that basis. This procedure is similarly unavailing. A circuit court's designation of an order as interim—even if accurate—is "surplusage [that] does not deprive this Court of jurisdiction to consider an appeal from that judgment." *Homestake Mining Co. v. S.D. Subsequent Injury Fund*, 2002 S.D. 46, ¶ 36, 644 N.W.2d 612, 622. Instead, "[i]t is the substance of the decision rather than its form or name that is the test of finality." *Griffin v. Dwyer*, 88 S.D. 357, 359, 220 N.W.2d 1, 2 (1974); *see also*

*Homestake Mining*, 2002 S.D. 46, ¶ 36, 644 N.W.2d at 622; *W. Bldg. Co. v. J.C. Penney Co.*, 60 S.D. 630, 636, 245 N.W. 909, 911 (1932). If the order is interim, it is so because the order "adjudicates fewer than all the claims" presented to the circuit court. SDCL 15-6-54(b).[6] Thus, neither the simple agreement of the parties nor the unilateral decision of a circuit court is sufficient to directly confer continuing jurisdiction on the circuit court.

[¶32.] Tony argues he was deprived of his "absolute right to appeal the judgment" and "to supersede enforcement of the judgment by way of a supersedeas bond." It is clear from the facts of this case that this argument is meritless. Although SDCL 15-26A-3 permits discretionary appeals from interim orders, Tony can hardly claim that he was denied his right to appeal in this case. Tony filed his first notice of appeal on March 25, 2014. Rick responded by asserting that no final order had been entered and asked this Court to dismiss Tony's appeal for lack of appellate jurisdiction. We ordered Tony to show cause why his appeal should not be dismissed. Upon receipt and review of the arguments of both parties, we ordered Tony's appeal to proceed. Tony has submitted briefs to this Court and was granted oral argument. In the meantime, the circuit court issued a final judgment. Therefore, it is difficult to conclude that Tony has been deprived of his right to appeal the circuit court's order when he has been allowed to do just that.

[¶33.] Tony's argument that he has been deprived of the opportunity to stay the execution of the circuit court's order is similarly meritless. Except under certain

---

6. We have previously recognized that the standard of finality used in SDCL 15-6-54(b) is also the standard of finality used "for purposes of appeal under SDCL [15-26A-3(1)]." *Riede v. Phillips*, 277 N.W.2d 720, 722 (S.D. 1979).

circumstances, "[a]n appeal from a judgment or order shall not stay enforcement of proceedings in the circuit court . . . unless the appellant executes a supersedeas bond in the amount and form approved by the circuit court[.]" SDCL 15-26A-25. Even if a circuit court refuses to set the terms of a supersedeas bond, a party may directly petition this Court to set the terms of the bond. SDCL 15-26A-39 provides:

> A motion for the relief provided in §§ 15-26A-25 to 15-26A-38, inclusive, may be made to the Supreme Court but said motion shall show that the application to the circuit court for the relief sought is not practicable or that the circuit court has denied an application or has failed to afford the relief which the applicant requested, with the reasons given by the circuit court for its action.

Although the parties debated the appropriate terms of a supersedeas bond, the record does not reflect that the circuit court ever set the terms of a bond or that Tony ever executed such a bond. More importantly, the record does not reflect that Tony ever applied to this Court for special relief under SDCL 15-26A-39. Therefore, because Tony had at least one unexhausted avenue of relief for staying the execution of the circuit court's order, he cannot claim he was deprived of such a right even if the circuit court had refused a formal request to set the terms of a supersedeas bond.

[¶34.] The foregoing also provides the basis for concluding that the circuit court had jurisdiction to hold the contempt hearings even if the December 23 order was a final order permitting Tony to appeal. "An appeal from a judgment or order strips the [circuit] court's jurisdiction over the subject matter of the judgment or order *except as to certain trivial matters . . . .*" *Reaser v. Reaser*, 2004 S.D. 116, ¶ 28, 688 N.W.2d 429, 437 (emphasis added) (quoting *Ryken v. Ryken*, 440 N.W.2d 307, 308 (S.D. 1989)). Such matters include "enforcing judgments in the absence of a

stay[.]" *Id.* As noted in the preceding paragraph, Tony's March 25, 2014 notice of appeal—even if proper—did not automatically stay the execution of the December 23 order. In order to have stayed the execution of that order, Tony was required to execute a supersedeas bond. SDCL 15-26A-25. It does not appear that Tony ever did so. Therefore, even if we were to conclude that Tony's notice of appeal generally deprived the circuit court of subject-matter jurisdiction, the court retained the power to enforce the December 23 order. Therefore, Tony was not deprived of his appellate rights.

[¶35.] We do not decide today whether the December 23 order was a final order because the answer to such question is not necessary to the resolution of the issues presented by the parties. However, our silence on this issue should not be viewed as condoning the practice of requiring an order to be executed prior to entering final judgment. As the United States Supreme Court has said:

> [W]e cannot approve of the manner in which this case has been disposed of by the decree. In limiting the right of appeal to final decrees, it was obviously the object of the law to save the unnecessary expense and delay of repeated appeals in the same suit; and to have the whole case and every matter in controversy in it decided in a single appeal. . . .
>
> . . . [T]he right to appeal is by law limited to final decrees. And if, by an interlocutory order or decree, [a party] is required to deliver up property which he claims, or to pay money which he denies to be due, and the order immediately carried into execution by the [c]ircuit [c]ourt, his right of appeal is of very little value to him, and he may be ruined before he is permitted to avail himself of the right. It is exceedingly important, therefore, that the [c]ircuit [c]ourts . . . , in framing their interlocutory orders, and in carrying them into execution, should . . . abstain from changing unnecessarily the possession of property, or compelling the payment of money by an interlocutory order.

> Cases, no doubt, sometimes arise, where the purposes of justice require that the property in controversy should be placed in the hands of a receiver, or a trustee be changed, or money be paid into court. But orders of this description stand upon very different principles from the interlocutory orders of which we are speaking.
>
> In the case before us, . . . it would certainly have been proper . . . for the [c]ircuit [c]ourt to have announced in an interlocutory order or decree the opinion it had formed as to the rights of the parties, and the decree it would finally pronounce upon the titles and conveyances in contest. But there could be no necessity for passing immediately a final decree . . . ordering the property to be delivered to the [opposing party]. The decree upon these matters might and ought to have awaited . . . [until] every matter in dispute might have been adjudicated in one final decree; and if either party thought himself aggrieved, the whole matter would be brought here and decided in one appeal, and the object and policy of the acts of Congress upon this subject carried into effect.

*Forgay v. Conrad*, 47 U.S. (6 How.) 201, 205-06, ___ S. Ct. ___, 12 L. Ed. 404 (1848).[7] Here, too, there is no discernible reason for ordering the formal transfer of property to occur prior to entering a final judgment. The fact that the circuit court later decided that the transfer documents, once signed, would be held but not recorded until after appeal supports the conclusion that actual, formal conveyance was not required to discern the tax consequences of the prospective transfers.

---

7. The Supreme Court reaffirmed this doctrine in *Radio Station WOW v. Johnson*, 326 U.S. 120, 126-27, 65 S. Ct. 1475, 1479-80, 89 L. Ed. 569 (1945). A number of states have adopted the *Forgay* doctrine. *See, e.g., Orem v. Moore*, 272 S.W.2d 60 (Ark. 1954); *Caminetti v. Imperial Mut. Life Ins. Co.*, 129 P.2d 432 (Cal. Dist. Ct. App. 1942); *Lambert v. Teisina*, 319 P.3d 376 (Haw. 2014) (per curiam); *Lyon v. Willie*, 288 N.W.2d 884 (Iowa 1980); *Kelly Inn No. 102, Inc. v. Kapnison*, 824 P.2d 1033 (N.M. 1992); *Maggi v. Sabatini*, 165 N.E. 454 (N.Y. 1929) (per curiam); *Hosp. Inns v. S. Burlington R.I.*, 547 A.2d 1355 (Vt. 1988); *Orlando Residence, Ltd. v. Nelson*, 834 N.W.2d 416 (Wis. Ct. App. 2013).

[¶36.] Next, Tony asserts that the circuit court erred in relying on Rick's attorney's affidavit at the March 13 contempt hearing, when it awarded Rick $500 per day for each day that Tony's cattle remained on land awarded to Rick in the corporate-property division. According to Tony, use of the affidavit to establish the "fair market rental value" of the land was improper because such was a disputed fact. Rick asserts that Tony's counsel agreed at the hearing "that there were no factual issues in dispute." Tony calls this a "fundamental mischaracterization of the contempt hearing proceedings" and asserts that he merely "did not dispute that the documents in question were not executed." We do not agree.

[¶37.] The circuit court did not err in relying on the affidavit. "The general rule is that attorney affidavits should not be used *unless the matter is uncontested or a mere formality.*" *Andrushchenko v. Silchuk*, 2008 S.D. 8, ¶ 11, 744 N.W.2d 850, 855 (emphasis added). At the March 13 contempt hearing, the circuit court asked Tony's and Rick's attorneys if they wanted an evidentiary hearing. The following discussion then occurred:

> **[Rick's Counsel]**: I would like to just put on some testimony and have the court consider my motion. . . .
>
> If we could continue—unless [Tony's counsel] is not disputing the allegations, the factual allegations, in my affidavit. If he's not, then we don't need evidence, we can just argue. So, I mean, maybe I'll put it to Tony's counsel.
>
> Are there disputed factual allegations? If there's not, the court can rely on my affidavit, and we can have legal argument.
>
> **[Circuit Court]**: All right. [Tony's Counsel]?
>
> **[Tony's Counsel]**: Your Honor, what I think I'd like to do is I think I would like to just have a legal argument here.
>
> What's set forth in [Rick's Counsel's] affidavit is primarily that Mr. Tony O'Neill has not executed the documents that were ordered in the court's December 23rd order.

> We do not dispute that those documents have not been executed. What we're saying is that a pre-appeal judgment enforcement is improper here.
>
> So, I think we can move forward with legal arguments regarding the correctness of the court's orders and the right to take Mr. O'Neill's appeal.
>
> **[Circuit Court]**: You may proceed.

The court offered to schedule an evidentiary hearing at a future date. Rick's counsel offered to engage in legal argument at the March 13 contempt hearing if the factual assertions in the affidavit were uncontested. When the circuit court asked Tony's counsel what he wanted to do, he did not contest anything in the affidavit or otherwise indicate he was objecting to Rick's terms for immediately proceeding with legal argument. Therefore, it was not error for the circuit court to rely on the uncontested rental value of $500 per day recited in the affidavit.

[¶38.]     ***5.     Whether the circuit court erred by denying Tony's request for disqualification.***

[¶39.]     After the March 13, 2014 contempt hearing, Tony informally requested the circuit court disqualify itself because on two occasions, the circuit court expressed its belief that Tony committed perjury. First, the circuit court reported its belief that Tony committed perjury to law enforcement officers and prosecutors of Bennett and Tripp Counties. Second, during the March 13, 2014 contempt hearing, the circuit court remarked that Tony "came into this courtroom . . . and lied from Day One. Committed perjury from Day One." Furthermore, Tony points out that after first reporting him for perjury on November 4, 2013, the circuit court subsequently participated in the resulting criminal investigation by speaking with Special Agent Goble over the phone on December 3, 2013. Thus, Tony asserts these statements, combined with the circuit court's participation in this telephonic

interview with Goble, created the appearance of a personal bias against Tony. The circuit court denied the request, concluding it was untimely and unfounded. We agree that the circuit court was not required to disqualify itself from the contempt proceedings.

[¶40.] The circuit court's first reason for denying Tony's request was that it was untimely under SDCL 15-12-24. Rick similarly argues that "South Dakota law provides a mechanism for a party to ask a Judge to [disqualify] himself or herself from [a] matter without stating a reason. The request for [disqualification] must be done prior to submitting argument or pleading to that particular judge." The court based its conclusion on SDCL 15-12-24, which states:

> The submission to a judge or magistrate of argument or proof in support of a motion or application, or upon trial, is a waiver of *the right thereafter to file an affidavit for change of such judge* or magistrate by any party or his counsel who submitted the same or who after notice that such matter was to be presented, failed to appear at the hearing or trial. Such waiver shall continue until the final determination of the action and includes all subsequent motions, hearings, proceedings, trials, new trials, and all proceedings to enforce, amend, or vacate any order or judgment.

(Emphasis added.) In response, Tony asserts that SDCL 15-12-24 does not preclude him from simply asking the circuit court to disqualify itself at any time. According to Tony, "the [circuit] court erred in refusing to [disqualify] itself upon the request of his counsel pursuant to SDCL 15-12-21.1."

[¶41.] In South Dakota, "an affidavit for change of a judge . . . may be filed in any action pending in the court[.]" SDCL 15-12-21. Before a party may file such an affidavit, he must "informally request the judge . . . who, in the ordinary course, would preside at the hearing or trial, to disqualify himself." SDCL 15-12-21.1. "The

submission to a judge . . . of argument or proof in support of a motion or application, or upon trial, is a waiver of the right thereafter to file an affidavit for change of such judge . . . ." SDCL 15-12-24. The affidavit must state that "the party making such affidavit has good reason to believe and does actually believe that such party cannot have a fair and impartial trial before the named judge[,]" but the affidavit need not actually state "the ground or reason for such belief." SDCL 15-12-26. Filing a timely and compliant affidavit results in mandatory, automatic disqualification. *State v. Peterson*, 531 N.W.2d 581, 583 (S.D. 1995).

[¶42.] A separate avenue for disqualification is found in our Code of Judicial Conduct. "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned[.]" SDCL ch. 16-2 app. Canon 3E(1). "The standard is an objective one, requiring disqualification where there is 'an appearance of partiality even though no actual partiality exists.'" *Marko v. Marko*, 2012 S.D. 54, ¶ 20, 816 N.W.2d 820, 826 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 108 S. Ct. 2194, 2202-03, 100 L. Ed. 2d 855 (1988)). Although a judge has discretion in determining whether the facts of a particular case meet the disqualifying criteria, a judge is required to disqualify herself if she determines such criteria have been met. *Id.* ¶ 18, 816 N.W.2d at 826. However, "a judge also has an 'equally strong duty not to [disqualify herself] when the circumstances do not require [disqualification].'" *Id.* ¶ 21, 816 N.W.2d at 826 (quoting Model Code of Judicial Conduct 187 (Am. Bar Ass'n 2004)).

[¶43.] The circuit court and Rick erroneously equate disqualification under Canon 3E with disqualification under SDCL chapter 15-12. The foregoing

discussion establishes that disqualification is appropriate either: (1) under chapter 15-12 when a party reasonably, subjectively believes the court incapable of deciding the issues fairly and files a compliant affidavit seeking a change in judge; or (2) under Canon 3E, including any time when it reasonably, objectively appears the court is not impartial, regardless of whether a party seeks disqualification. Neither the circuit court nor Rick has cited any authority to suggest the court's obligation under Canon 3E terminates at the point at which a party's right to seek a change of judge under chapter 15-12 terminates, and we see nothing in SDCL 15-12-24 that barred Tony from simply asking the circuit court to reevaluate its ongoing ethical duties. *See Marko*, 2012 S.D. 54, 816 N.W.2d 820 (reviewing informal request for disqualification not made under chapter 15-12 as request was made during trial). Therefore, whether the circuit court was required to disqualify itself under Canon 3E is a question independent of any action on Tony's part.

[¶44.] Nevertheless, the circuit court was not required to disqualify itself in this case. Not all partiality requires disqualification. "Disqualification 'was never intended to enable a discontented litigant to oust a judge because of adverse rulings made.'" *Marko*, 2012 S.D. 54, ¶ 21, 816 N.W.2d at 827 (quoting *Ex parte Am. Steel Barrel Co.*, 230 U.S. 35, 44, 33 S. Ct. 1007, 1010, 57 L. Ed. 1379 (1913)). "Ordinarily, a judge cannot be disqualified for views formed on the basis of what the judge learned in court." *Id.* ¶ 23, 816 N.W.2d at 827 (citing *Liteky v. United States*, 510 U.S. 540, 550-56, 114 S. Ct. 1147, 1155-58, 127 L. Ed. 2d 474 (1994)).

> The judge who presides at a trial may, upon completion of the
> evidence, be exceedingly ill disposed towards the defendant, who
> has been shown to be a thoroughly reprehensible person. But
> the judge is not thereby recusable for bias or prejudice, since his

> knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

*Liteky*, 510 U.S. at 550-51, 114 S. Ct. at 1155.[8] "A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id.* at 551, 114 S. Ct. at 1155. Thus, "'[p]artiality' does not refer to all favoritism, but only to such as is, for some reason, wrongful or inappropriate." *Id.* at 552, 114 S. Ct. at 1156. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment *impossible*." *Id.* at 555, 114 S. Ct. at 1157 (emphasis added).

[¶45.] Tony does not assert that the court's opinion of him was based on anything other than information acquired during the course of this litigation. Instead, the entirety of Tony's argument for disqualification revolves around the circuit court's conclusion that Tony perjured himself at trial. Thus, Tony must show that the circuit court was so antagonistic that "fair judgment [was] impossible." *Id.*

---

8.   In *Liteky*, the Supreme Court extended this "extrajudicial source" doctrine to 28 U.S.C. § 455(a). *Liteky*, 510 U.S. at 554, 114 S. Ct. at 1157. Section 455(a) is the federal analogue of Canon 3E(1). *Compare* 28 U.S.C.A. § 455(a) (West 2015) ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.") *with* SDCL ch. 16-2 app. Canon 3E(1) ("A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . .").

Yet, whatever antagonism the court might have harbored against Tony manifested only as one letter sent to law enforcement that the court believed it was legally bound to send and one comment at the contempt hearing. "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* We see no reason why the comment made during the contempt proceeding would fall outside this general rule.

[¶46.]     As for the letter, the court waited to report Tony's perjury until it had rendered its findings of facts and conclusions of law and released them to the parties, even though the court did not technically file its findings until December 23, 2013. Although Tony claims the court "actively participated as a witness in a perjury investigation against Tony[,]" this is an exaggeration of the circuit court's involvement. The State did not bring perjury charges against Tony until early 2015—after the circuit court entered final judgment (by anyone's measure) in this case. The only evidence in the record of the court's involvement in the perjury investigation is the affidavit of Special Agent Goble submitted in support of the complaint, which indicates he "interviewed Judge Trandahl by telephone" on December 3, 2013. Based on the affidavit, the interview appears to have simply been a recitation of what occurred at trial and the basis for the court's belief that Tony had committed perjury. Objectively viewing the facts, the court's statements and letter to law enforcement are not so antagonistic as to make fair judgment impossible. Based on the foregoing and the fact that the court's opinion of Tony was formed as a result of information acquired during the course of this litigation, we

see no basis upon which the circuit court's "impartiality might *reasonably* be questioned." *Marko*, 2012 S.D. 54, ¶ 23, 816 N.W.2d at 827 (emphasis added). Therefore, the circuit court did not err in denying Tony's request for disqualification.

**Conclusion**

[¶47.] The circuit court's factual determinations that Tony signed the LSA and that the crop-insurance check was not a corporate asset are not clearly erroneous. Tony was not deprived of his appellate rights. Because he failed to seek a stay of execution, the circuit court had jurisdiction to enforce the December 23 order regardless of whether Tony's first notice of appeal generally deprived the court of subject-matter jurisdiction. The circuit court's statements and letter to law enforcement regarding its belief that Tony perjured himself do not provide a reasonable basis for questioning the court's impartiality as the court's conclusions were formed from evidence produced at trial and were not so antagonistic as to make a fair trial impossible. However, the circuit court erred in using punitive damages to punish Tony for potential harm inflicted on nonparties. This case presents no vehicle for punitive damages, especially in the absence of a compensatory-damage award. Therefore, we reverse the circuit court's award of punitive damages and affirm the other issues presented.

[¶48.] GILBERTSON, Chief Justice, and ZINTER and SEVERSON, Justices, and SOMMERS, Circuit Court Judge, concur.

[¶49.] SOMMERS, Circuit Court Judge, sitting for WILBUR, Justice, disqualified.